## Redevelopment Authority of the City of Erie *v.* Owners or Parties in Interest.

Argued October 20, 1970, before President Judge BOWMAN, and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MANDERINO, MENCER and BARBIERI (who has since been appointed to the Supreme Court of Pennsylvania and did not participate in the decision).

*Irving Murphy,* with him *John J. Stroh,* and *Mc-Donald, Illig, Jones and Britton,* for appellants.

*John M. Quinn,* with him *Quinn, Plate, Gent, Busek and Leemhuis,* for appellee.

OPINION BY JUDGE MENCER, February 16, 1971:

This appeal involves the condemnation of a three-story building located at 924 State Street in the main business district of Erie, Pennsylvania. The Redevelopment Authority of the City of Erie filed, in connection with this property, a Declaration of Taking on December 13, 1968. Preliminary objections[1] challenging the taking of the property were filed by the owners, hereinafter referred to as the appellants, but they were dismissed by the Court of Common Pleas of Erie County. We believe the preliminary objections should have been sustained.

The property in question was purchased by appellants in 1954. At that time, and now, their neighbor to the north was a Murphy's Five and Ten Cent Store. Their neighbor to the south was a three-story structure owned by Mr. Achilles Pulakos, hereinafter referred to as Pulakos, and leased by him to a family corporation, known as Pulakos' Candies, for use as a retail candy store. These properties are located on the west side of State Street, and both the appellants' property and the property of Pulakos are small lots with frontages of twenty feet on State Street and depths of 147 feet.

Appellants' property was originally leased for a retail drug store and later subleased to a discount drug chain for the same purpose. The first floor was used

---

[1] Preliminary objections constitute the exclusive method of challenging condemnation proceedings under the Eminent Domain Code. *Mahan v. Lower Merion Township,* 418 Pa. 558, 212 A. 2d 217 (1965).

as a drug store and the second and third floors were vacant.

In October of 1962, the City Planning Commission of the City of Erie certified the Downtown Erie Project Area, which included appellants' property, as a blighted area. The Council of the City of Erie, pursuant to the Urban Redevelopment Law of Pennsylvania, Act of May 24, 1945, P. L. 991, 35 P.S. §1701, as amended, directed the Redevelopment Authority of the City of Erie to prepare a Redevelopment Proposal for the elimination of the blighted and substandard conditions in the project area. The proposal that was developed, with the help of a firm of expert planners, provided that appellants' property, the Pulakos property, and several other properties, be assembled to provide the needed land area for the construction of a downtown hotel. If this proposal had been followed, the appellants likely would not have had a basis to oppose the condemnation of their property because, as was said in *Schenck v. Pittsburgh,* 364 Pa. 31, 35-36, 70 A. 2d 612, 614 (1950), ". . . in the absence of an indication that the Commission did not act in good faith or was wholly arbitrary in certifying the area designated by it as blighted, its certification to that effect is not subject to judicial review," and, "since [the Urban Redevelopment Law] gives the power of eminent domain to the Urban Redevelopment Authority, it is for that agency, and not for the courts, to determine whether or not the power should be exercised in this particular instance. It has been held in many cases that where the right of eminent domain is vested in a municipality, an administrative body, or even a private corporation, the question as to whether the circumstances justify the exercise of the power in a given instance is not a judicial one, at least in the absence of fraud or palpable bad faith." See also: *Schwartz v. Urban Redev. A. of Pgh.,* 416 Pa. 503, 206 A. 2d 789 (1965).

It is the phrase "palpable bad faith" that is the root consideration raised in this appeal. These words have vital meaning when used as a limitation on the power of a governmental authority to condemn property. Bad faith is generally the opposite of good faith and, under the factual situation of the present case, implies a tainted motive of interest. Bad faith becomes palpable when such motive is obvious or readily perceived. The courts have the responsibility to see that an authority has not acted in bad faith, and that property be taken by eminent domain only to the extent reasonably required for the purpose for which the power is exercised.

Activities of public authorities should be subject to judicial scrutiny. We agree with what Justice ROBERTS said in *Price v. Philadelphia Parking Authority*, 422 Pa. 317, 329, 221 A. 2d 138 (1966) : "As public bodies, they exercise public powers and must act strictly within their legislative mandates. Moreover, they stand in a fiduciary relationship to the public which they are created to serve and their conduct must be guided by good faith and sound judgment. See Schwartz v. Urban Redevelopment Auth., 411 Pa. 530, 536, 192 A. 2d 371, 374 (1963); Heilig Bros. Co. Inc. v. Kohler, 366 Pa. 72, 77-78, 76 A. 2d 613, 616 (1950). The mushrooming of authorities at all levels of government and the frequent complaint that such bodies act in an arbitrary and capricious manner in violation of existing law dictate that a checkrein be kept upon them. Schwartz v. Urban Redevelopment Auth., 411 Pa. 530, 536, 192 A. 2d 371, 374 (1963); Keystone Raceway Corp. v. State Harness Racing Comm., 405 Pa. 1, 5, 173 A. 2d 97, 99 (1961)."

In the instant case the original proposal was changed. What caused the change to be made? An examination of the record discloses that Pulakos decided that he would fight the taking of his property.

384

He was determined to show the Redevelopment Authority that acquiring his property was not going to be as easy as taking candy from a baby. He had a recipe which he believed would produce for himself a sweet result. The chief ingredient that he had at his disposal was political influence. Mr. Adolph Agresti, Vice Chairman of the Authority, testified that Pulakos (and family) "had doors open to him." A review of what transpired to satisfy Pulakos is indeed revealing of how the doors swung open to Pulakos and shut to appellants.

The Authority began by offering Pulakos several other downtown properties but none was acceptable to him. If this was not the answer, what would be satisfactory to Pulakos? How about deleting appellants' lot from the property being assembled for hotel development and selling it to Pulakos? If this could be accomplished, then Pulakos could merely move his candy store next door and everything would be dandy.

The mix was started in 1966 by John Corapi, Executive Director of the Authority, travelling to Memphis, Tennessee, in an effort to convince Holiday Inns that the hotel could be built in Erie without using appellants' property. The effort was unsuccessful. The Authority next turned its attention to Metropolitan Hotels, Inc., of Baltimore, Maryland. The Vice Chairman, the Executive Director and the Assistant Director of the Authority, together with the Mayor of the City of Erie, travelled to Baltimore with Gus Pulakos and his son, Achilles Pulakos. The testimony of Adolph Agresti, Vice Chairman of the Authority, is most enlightening as to what occurred at the meeting in Baltimore: "Q. Mr. Agresti, coming to the events which lead to the deletion of the Kaufman parcel[2] from the transit hous-

---

[2] Appellants' property was variously identified in the record as "Kaufman property", "924 State Street", "Brown-Jones" and the "White Cross property".

ing offer, would you explain in your words what occurred from your personal knowledge? A. Well, during the interim from 1966 to the present time, or 1968, the past two years we were fortunate enough to have the Hilton Hotel or the Statler Hilton Hotel people show an interest in the location on tenth and State, and the developers are called the Metropolitan Hotel in Baltimore. They have the franchise and they have, we've had negotiations with them for several months, eight or ten months, in regards to the location, the size of the land and number of rooms, and so forth, and in the meantime we tried to negotiate the twenty feet for Pulakos and we were not successful. So, *with pressures to bear,* whether it be members of Council or the Mayor, they prevailed on the Authority that we should probably set up a meeting in Baltimore with the hotel people. Q. Were you present at that meeting? A. Yes. Q. Were you the Authority representative at that meeting? A. I was the only member of the Authority with our executive directors. Q. Continue. A. And the Mayor was at the meeting with the two Pulakos, Gus and Achilles. We had a meeting with the staff of the Metropolitan Hotels, Inc. and some of the Hilton officials and we met with them most of the day, and at that time they showed us a prototype that would be feasible for Erie, and when we approached them on the subject of deleting the twenty feet *for Pulakos,* they were upset about this because they felt that they needed as many sleeping rooms as possible, and at the present time they were planning on 250 sleeping rooms and deleting this twenty feet, they would sacrifice 18 sleeping rooms, and this, they did not like, and *they thought the Authority was wrong* to allow this twenty feet because *they needed all the land they wanted,* but *because of the pressures being put upon them,* they were willing to concede and modify their plans and be satisfied with

232 sleeping rooms instead of the 250, and, of course, they wanted an adjustment in the land price. Q. Are you aware of the dollar amount of that adjustment? A. Well, at the time of the first proposal, six months prior to that, the offer was $125,000 from the Metropolitan Hotels and when their preferential treatment expired, they gave us another offer which was only $100,000." (Emphasis supplied.)

Thus, not having been successful in previous negotiations, the Authority and the Mayor applied pressure to force Metropolitan Hotels, Inc., to modify its plans with an adjustment of the land price offer from $125,-000 to $100,000. The Pulakos interests were to be served at the expense of the public and of the appellants.

Much paperwork and backtracking then had to be done to move the plan from the back burner of the Baltimore meeting to the front burner of legal respectability. The formal proposal of Metropolitan Hotels, Inc., had to be amended and resubmitted as to price and number of rooms. The Urban Renewal Plan for the Downtown Erie Urban Renewal Project had to be modified and amended to eliminate appellants' lot from the transient housing assemblage and reclassified as to use to Commercial Retail. Approval of such modifications and amendments had to be obtained from the local, state and federal agencies involved. Updated re-use appraisals had to be obtained and a formal invitation extended to Pulakos to submit a proposal to relocate his business on appellants' lot. The Authority, on October 4, 1968, requested a letter of intent by November 5, 1968, and a proposal by December 17, 1968. The letter of intent was received on time but the time for receipt of the proposal was extended to February 4, 1969, and finally to April 1, 1969. The Authority's minutes of March 4, 1969, stated that if Pulakos did

not submit a proposal by April 1, 1969, the Authority would withdraw the *exclusive status* of Pulakos to acquire appellants' property.

Was the modification of the Urban Renewal Plan for Downtown Erie solely to enable Pulakos to acquire appellants' land, or was it justified by planning considerations and the final disposition to Pulakos only incidental thereto? The testimony of Charles H. Reeve, Director of Planning and Urban Renewal for the consulting firm of James P. Purcell Associates, was as follows: "Q. Mr. Reeve, are you aware that the Authority is proposing to eventually convey the White Cross parcel to Mr. Pulakos if the preliminary objections in this matter are eventually dismissed by the courts? A. Yes, I am. Q. State, in your professional opinion, your thinking in regard to this program. A. Well, with all due regard for Mr. Pulakos, who has been in Erie for a long period of time, and the consideration that is being extended to him, I feel, from a planning standpoint, it is a mistake. Q. Would you amplify that last remark of yours to the degree of explaining what you may think should be done with this parcel? A. Well, I think this should be included in the parcel as it was originally proposed to have the development of a transient housing site, that is, a motel or motor hotel, so that the whole development can be handled as an integrated complex of shops and stores serving both downtown and the transient housing facility. To sliver off the so-called White Cross parcel for Mr. Pulakos will merely perpetuate a situation which I have already identified as a blighting characteristic. . . . Q. Now, let's get on to what—I understood you to be somewhat critical of the actions of the Redevelopment Authority in intending to supply the White Cross parcel to Mr. Pulakos. Do I understand you to say you think this is very poor planning? A. Yes sir. Q. Does it make

any economic sense to you at all, from an economic or social use of the premises? A. I think if there were some way that they could accommodate Mr. Pulakos and integrate him into the motel-hotel development instead of as a separate parcel, it would be far superior, and would represent, in my mind, what would be good planning, as against a single isolated parcel, which I believe is one of the faults in terms of the downtown areas that exist today, and we're going to retain this. This, to me, I think is poor planning, and I would have hoped that they would be able to integrate him into the commercial development. Q. This is what I was curious about; the concept of providing Mr. Pulakos with a twenty-foot strip is exactly the concept that you say good planning attempts to avoid, am I correct? A. Yes."

Mr. William L. Siskind, Director and Chairman of the Board of Metropolitan Hotels, Inc., testified that "the only reason that we even considered making that last proposal was the overwhelming pressure, or of factors that were presented to us, to allow preferential treatment to this one particular businessman in Erie, in that the White Cross property was to go to him, that twenty feet was to go to him. If it doesn't go to him, there is no reason for us ever excluding it, and we would want the property to be included as per the original proposal." He further testified that he did not like excluding the appellants' property since it was a needed piece of property for the development of the hotel.

The Urban Redevelopment Law grants to an authority the power to sell any real property in a redevelopment area provided that the sale will not be prejudicial to the realization of the redevelopment proposal. Act of May 24, 1945, P. L. 991, as amended, 35 P.S. §1709(k). The testimony of Mr. Reeve and Mr. Sis-

kind points to the prejudicial nature of the sale to Pulakos. The power to sell does not exist when prejudice will result.

The true fact is that the appellants' land was to be acquired for the sole purpose of relocating the Pulakos store. This had been arranged *prior* to the filing of the Declaration of Taking as to appellants' property. The Authority conceded that appellants' property, after demolition of the building, would be conveyed to the Pulakos interests who would then erect a one-story candy store occupying the entire lot. This would result in the land continuing to be used as a retail store, with the identity of the owners being the only thing changed. The Authority's own records show that during October, 1968, action was taken to amend the Urban Renewal Plan, to obtain necessary approval of such amendment and to "sincerely solicit" an exclusive proposal from Pulakos for the sole purpose of obtaining the property in question for the benefit of Pulakos. The Authority contends that it could give such preference to Pulakos because it had a policy of preferential treatment in land disposition. However, such a policy of preferential treatment must only be applied to the disposition of land which the Authority has in fact acquired for a *public* purpose, and only when the land is no longer needed because the public purpose has been fulfilled. Such a policy does not provide the Authority with any power to acquire one man's land by condemnation in order to satisfy another man's needs. It is one thing to condemn a given quantity of land for a public purpose and after a period of time, or the fulfillment of the purpose, dispose of a portion of the land as no longer needed, and it is another to accomplish the public purpose with a smaller quantity of land and yet condemn an additional parcel for a private purpose. In the first instance the policy of preferential

treatment is proper but in the second it is reprehensible.

Nothing, of course, is better settled than that property cannot be taken by government without the owner's consent for the mere purpose of devoting it to the private use of another. In *Lance's Appeal*, 55 Pa. 16, 25 (1867), the Supreme Court held that the power of eminent domain can never be exercised except for a public purpose supposed and intended to benefit the public, and that "after the right has been exercised the use of the property must be held in accordance with and for the purposes which justified its taking. Otherwise, it would be a fraud on the owner, and an abuse of power."

In *Philadelphia Clay Co. v. York Clay Co.*, 241 Pa. 305, 309-310, 88 A. 487 (1913), the court stated the following: "While the power of the legislature to invest individuals or corporations with the right to take private property for a public use is clearly recognized by the Constitution, there is not a suggestion anywhere that private property may be taken for a private use. It has been uniformly held by the courts in our own state as well as in other jurisdictions that under the right of eminent domain private property can only be taken for a public use, and that it is not within the power of the legislature to invest either an individual or a corporation with the right to take the property of a private owner for the private use of some other individual or corporation even if a method is provided for ascertaining the damages and paying what shall be deemed just compensation. The underlying principle is that the owner of property has the right to the uninterrupted use and enjoyment of it against all the world, subject, however, to the sovereign right of the state to take so much of it as may be necessary to serve the various public uses to which it may be properly subjected."

This reasoning is still valid and has in no way been altered by *Belovsky v. Redevelopment Authority,* 357 Pa. 329, 54 A. 2d 277 (1947), which held that the Urban Redevelopment Law was constitutional. It is also important to recognize that the Urban Redevelopment Law grants enormous powers and must carefully be examined under the facts in each case, in the light of the constitutional guarantees which relate to the right of private property. See Chief Justice BELL's concurring opinion in *Faranda Appeal,* 420 Pa. 295, 302, 216 A. 2d 769 (1966).

In *Belovsky,* supra, the court recognized the principle that the owner of property has the right to the uninterrupted use and enjoyment of it, subject to the right of the sovereign to take so much of it as may be necessary to serve the various public uses. The court stated, at page 341 of *Belovsky,* as follows: "Indeed, so far from it being legally objectionable that property acquired by eminent domain be resold or retransferred to private individuals after the purpose of the taking is accomplished, the law actually requires that property be taken by eminent domain only to the extent reasonably required for the purpose for which the power is exercised (*Bachner v. Pittsburgh,* 339 Pa. 535, 539, 15 A. 2d 363, 365) and upon cessation of the public use the public ownership is properly discontinued."

Therefore, property can only be acquired to the extent reasonably required for the public, not private, purpose for which the power is exercised. In the instant case the original plan was to condemn appellants' property for the building of a hotel which the lower court found to be for the economic and social betterment of the community. This would have been a public use with only incidental private benefit to the hotel owners. However, that public use had been completely abandoned long before December 13, 1968, when the

Declaration of Taking was filed. At that time the hotel project was assured, without the necessity of appellants' land, which had been reclassified for commercial retail purposes and promised to Pulakos. In the instant case the purpose for condemning appellants' land on December 13, 1968, was clearly not for the purpose of the hotel project or any other public purpose, but only to solve Pulakos' problem of resettling. It cannot be determined that the public good is enhanced by replacing a drug store with a candy store by the vehicle of condemnation.

The *Belovsky* case also held, at page 340, that: "When, therefore, the need for public ownership has terminated, it is proper that the land be re-transferred to private ownership, subject only to such restrictions and controls as are necessary to effectuate the purposes of the act. It is not the object of the statute to transfer property from one individual to another; such transfers, so far as they may actually occur, are purely incidental to the accomplishment of the real or fundamental purpose."

In the instant case the sale to Pulakos, after modification of the plan, would not be incidental to the accomplishment of the fundamental purpose, or after the accomplishment of any public purpose, but rather the solution to Pulakos' problem of where to relocate his business.

The Authority asserts that once an urban renewal area is determined to be blighted it follows that any parcel within the area can be condemned without regard to the reason for the condemnation. This overlooks the essential requirement that for any particular taking to be constitutional it must be for a public purpose. The converse is equally true. If the taking is not for a public purpose, it is unconstitutional.

A district Court of Appeal of Florida recently ruled on this question in *Brest v. Jacksonville Expressway*

*Authority,* 194 So. 2d 658 (1967), which was affirmed by the Supreme Court of Florida at 202 So. 2d 748. In *Brest,* an Expressway Authority attempted to condemn land outside of the land needed for construction of the expressway, the purpose being to relocate a private railroad track which had been within the needed right-of-way. The benefit of the condemnation would accrue only to a private railroad company which did not have the right of eminent domain. Appellants' property, on December 13, 1968, was not needed for the public purpose of constructing a hotel for the economic and social betterment of the community and therefore the benefit of condemnation would accrue only to Pulakos who did not have the right of eminent domain.. The court, in *Brest,* held that: "The Legislature cannot under the guise of exercising sovereign power of eminent domain, which can only be exerted for a public purpose, take a citizen's property without his consent and give or sell it to another for private use, even though compensation is paid therefor, for to do so would be in violation of the Constitution of the United States, Amendment 14. Also the power to take private property is in every case limited to *such* and *so much* property as is necessary for the public use in question."

The Authority contends that it has condemned appellants' land for the lawful purpose of eliminating a substandard structure located within a blighted area. Such a condemnation, following the refusal of the Authority to allow the appellants to repair and rehabilitate their building, is one made in palpable bad faith. The record in this case establishes that the appellants are as ready and able as is Pulakos to eradicate the substandard or blighted conditions on their land. The Authority refused to allow the appellants to do so but made arrangements to sell the land to Pulakos to accomplish the very same purpose. Yet the Urban Re-

development Law contemplates rehabilitation of individual structures: Section 3(m), 35 P.S. §1703(m), in the definition of the word, "redevelopment," discusses a program of "voluntary repair and rehabilitation of buildings"; Section 9(b), 35 P.S. §1709(b), in enumerating the powers of an authority, also refers to "voluntary repair and rehabilitation"; Section 2(c.1) 35 P.S. §1702(c.1) declares as a matter of legislative finding that certain portions of blighted areas may be susceptible to rehabilitation in such manner that the conditions and evils enumerated in the Act may be eliminated or remedied.

The record establishes that the appellants were never notified as to what building defects the Authority considered in reaching the determination that the building was substandard. Even when appellants requested information on this matter, the Authority refused to supply it until after condemnation. All of this further suggests that the Authority's real reason for condemning the property was to provide a new home for Pulakos' Candies and not to remove a substandard building. Such action is constitutionally impermissible.

We conclude that (1) the pressure exerted on the redeveloper; (2) the modification of the redevelopment plan to the prejudice of the plan; (3) the refusal to permit appellants to eradicate the blighted condition of their property and (4) the understanding with Pulakos that he should receive appellants' property, prior to the filing of the Declaration of Taking, were sufficient circumstances to constitute palpable bad faith. Therefore, such a taking was beyond the power conferred upon the Authority by law. Where good faith is absent, the actions of governmental bodies will be set aside. See *Goodman Appeal*, 425 Pa. 23, 227 A. 2d 816 (1967); *Heilig Bros. Co. Inc. v. Kohler*, 366 Pa. 72, 76 A. 2d 613 (1950).

Findings of fact made by a chancellor who saw and heard witnesses, when confirmed by the court en banc,[3] will not be reversed on appeal if they are supported by adequate evidence: *Pregrad v. Pregrad,* 367 Pa. 177, 80 A. 2d 58 (1951). However, that well-settled principle is confined to findings which are true and genuine findings of fact. With respect to inferences and deductions from facts and conclusions of law, both the court en banc and the appellate courts have the power to draw their own inferences and make their own deductions and conclusions. *Felt v. Hope,* 416 Pa. 118, 206 A. 2d 621 (1964); *Kalyvas v. Kalyvas,* 371 Pa. 371, 89 A. 2d 819 (1952). We cannot agree with the conclusion of the chancellor "that there is no evidence before the Court to indicate that the Authority acted fraudulently, arbitrarily, capriciously or in bad faith in condemning the property of the owners." The chancellor indicated that his conclusion was reached because appellants' property was substandard in 1963 and was located in an area of blight. The chancellor, in his Opinion, said, "All structures in the area not having been marked for removal, was the Authority justified in condemning this specific property? Again the testimony leaves little doubt that this must be answered in the affirmative, for despite the fact that the three-story structure can be rehabilitated by the elimination of the top two floors, it is and was at the time of the inspection (December 20, 1963) sub-standard."

However, this overlooks what happened after December 20, 1963. It disregards the pressure applied to the redeveloper; the prejudicial modification of the redevelopment plan; refusal to permit appellants to rehabilitate their property once it had been removed from the redevelopment plan and the understanding to sell

---

[3] The record does not disclose that a court en banc did affirm the chancellor's findings of fact.

appellants' land to Pulakos even before the Declaration of Taking was filed.

It would be incorrect to conclude that had the concoction stirred up by the Pulakos problem been allowed to simmer a bit longer on the back burner, the final product would have been more salable and certainly more palatable. Such a conclusion would be erroneous since time alone could not have distilled away the prejudice to the original public plan that would have provided a larger hotel, $25,000 more money for the City, better utilization of the land, and equal treatment to both Pulakos and appellants.

Our ruling today deals only with the legality of the Declaration of Taking filed on December 13, 1968. There is no need for us to speculate concerning what should be done if appellants do not rehabilitate their property and correct the substandard condition of their building. We likewise refrain from any speculation or consideration as to any future condemnation of appellants' property. Any such condemnation would have to be judged on the facts and law pertaining to it as of the time of taking.

For the reasons stated, the order of the chancellor dismissing the appellants' preliminary objections is reversed, the preliminary objections are sustained, and the Declaration of Taking of appellants' property by the Redevelopment Authority of the City of Erie is quashed. Costs to be paid by the Redevelopment Authority of the City of Erie.

———

CONCURRING OPINION BY JUDGE CRUMLISH, JR.:

The City of Erie has undertaken to rehabilitate a twelve-block section now known as the Downtown Erie Urban Redevelopment Project Area. The parcel of land in question here is a single lot in one of the blocks to be affected. Initially, the City had planned for the

reuse of the entire block for transient housing. Subsequent to the approval of this plan, the City altered its proposals so as to carve out one lot from this block for commercial use as a retail store. It is undisputed that the purpose in changing the permitted reuse was to accommodate the relocation of a local business. Exclusive rights to redevelop the parcel were accorded this businessman, Pulakos, even prior to the final reconsideration of the permitted redevelopment of the block in question.

The majority finds this maneuver to evidence palpable bad faith on the part of the condemnor, Redevelopment Authority of the City of Erie. In reaching this conclusion, much is made of the fact that Pulakos "had doors open to him". The activity on the part of city officials is characterized as political favoritism for the sole purpose of Pulakos' personal gain. In essence, it is held that City officials awarded Pulakos the exclusive rights to redevelop the commercial section purely for private political reasons, thus evidencing palpable bad faith which would not justify the use of its power of eminent domain. I cannot agree with that conclusion.

The record does not provide a sufficient basis upon which to support the evil motives attributed to the officials of the City. Their activity could have been and presumptively is properly motivated by a desire to retain for the City a business entity which is desirable in relation to the economic well-being of the area. It is unwise and unappropriate for this Court to castigate the motive of the governmental servants in Erie absent evidence of improper conduct.

The majority holds that the original public purpose for the taking of the block in question was for the public use of constructing a hotel, and that when this reuse was changed so that a parcel could be conveyed to

Pulakos, the public use was changed to a private use: "Appellants' property, on December 13, 1968, was not needed for the public purpose of constructing a hotel for the economic and social betterment of the community and, therefore, the benefit of condemnation would accrue only to Pulakos who did not have the right of eminent domain." Since the power of eminent domain is limited to only "so much property as is necessary for the public use in question. . .", *Brest v. Jacksonville Expressway Authority*, 194 So. 2d 658 (Fla. 1967), it is concluded that only that part of the block to be used for the hotel is subject to taking.

In reaching this conclusion, the Court has failed to consider the purposes of condemnation as related to the entire twelve-block area to be redeveloped. Instead, it has considered this one block alone to be a condemnation for a continuing public use, like that of a highway, school, etc. I cannot agree that merely because the reuse of this parcel was changed from what might have been a public use to what is now to be a private use, the primary public purposes attendant to redevelopment—the removal of blight and the restoration of the area—would not apply to this parcel as they do the others in the redevelopment area.

The Urban Redevelopment Act of 1945, 35 P.S. 1702, clearly states the purposes which justify condemnation in the twelve-block redevelopment area of Erie: "Therefore, it is hereby declared to be the policy of the Commonwealth of Pennsylvania to promote the health, safety and welfare of the inhabitants thereof by the creation of bodies corporate and politic to be known as Redevelopment Authorities, which shall exist and operate for the public purposes of the *elimination of blighted areas through economically and socially sound redevelopment of such areas,* as provided by this Act. . . . Such purposes are hereby declared to be the public

uses for which public money may be spent, and private property may be acquired by the exercise of the power of eminent domain. . . ." (Emphasis added).

This was upheld in *Belovsky v. Redevelopment Authority of Philadelphia*, 357 Pa. 329, 340, 54 A. 2d 277 (1947). "Nothing, of course, is better settled than that property cannot be taken by government without the owner's consent for the mere purpose of devoting it to the private use of another, even though there be involved in the transaction an incidental benefit to the public. But plaintiff misconceives the nature and extent of the public purpose which is the object of this legislation. That purpose, as before pointed out, is not one requiring a continuing ownership of the property as it is in the case of the Housing Authorities Law in order to carry out the full purpose of that Act, but is *directed solely to the clearance, reconstruction and rehabilitation of the blighted area, and after that is accomplished the public purpose is completely realized.*" (Emphasis added).

The Redevelopment Authority can only exercise its power of eminent domain for these purposes, and it was with this intent that the twelve downtown blocks in the redevelopment were to be taken in part. The Authority did not have the authority under the Act to condemn solely for the purpose of building a public building, i.e., a hotel. The public purpose for the condemnation of that block has always been those enumerated in the Act creating that power in the Authority. The change in reuse does not eliminate these purposes.

I agree with the majority that "courts have the responsibility to see that an authority has not acted in bad faith and that property be taken by eminent domain only to the extent reasonably required for the purpose for which the power is exercised; and the case before us is demonstrative of how the refusal of the

agency to fully consider the reasonable extent of its requirements lends itself to a consideration of what may be called sufficiently "palpable bad faith" to invalidate its taking.

An area should be considered in its entirety and not in its severable parts. Accordingly, the lack of blight in one parcel of a block or the ability of one lot owner to rehabilitate his property would not necessarily render that parcel or lot exempt from a proper condemnation. *Crawford v. Redevelopment Authority,* 418 Pa. 549, 211 A. 2d 866 (1965) ; *St. Peter's v. Urban Redevelopment Authority of Pittsburgh,* 394 Pa. 194, 146 A. 2d 724 (1958). But in such cases the parcel is usually necessary for the assemblage of lots for a large project, such as the hotel in this case.

Where the property is not the subject of a large reuse project, though, the Legislature has limited the power of eminent domain by providing for "voluntary repair and rehabilitation". 35 P.S. §1709(b). If the lot in question is only being taken for clearance, reconstruction and rehabilitation without substantial alteration as to its lot size and reuse, the Authority should only take it upon a clear finding that rehabilitation is either not feasible or not requested.

Appellants' lot would not have been subject to rehabilitation if the prospective hotel reuse had been retained. But when their property was replanned so as to retain its identity and commercial use, rehabilitation became a viable alternative. Appellants requested permission to institute such a project, but the record is clear that the alternative was never seriously considered. The Authority instead gave a reuse preference to Pulakos which excluded any consideration of rehabilitation.

I cannot find that this condemnation was in fact an excessive taking because rehabilitation was appropriate.

The record does not disclose the feasibility of appellants' rehabilitation plan. It is evident, however, that the refusal of the Authority to even consider this alternative and their exclusive dealing with Pulakos regardless of their motivation regarding reuse is irrefutable evidence of palpable bad faith on the part of the condemnor. For this reason, I would reverse.

DISSENTING OPINION BY JUDGE MANDERINO:

I dissent from the holding of the majority because the issue raised in this case has been well settled by Pennsylvania law. The appellants are attempting to stop the condemnation of their property by claiming that the Redevelopment Authority of the City of Erie did not have the right to condemn their property. This case comes before this court on preliminary objections.

In 1962 the area in which appellants' property is located was certified as blighted. The appellants have never contested this. A 1965 report determined that appellants' property was substandard and substantial evidence contained in the record supports this conclusion. Indeed, no other conclusion is possible from the record. These conclusions support the Authority's power to condemn the appellants' property. It is a part of a blighted area, certified as a redevelopment area, and the property itself is substandard. The power to condemn cannot be denied. *Belovsky v. Redevelopment Authority of City of Philadelphia*, 357 Pa. 329, 54 A. 2d 277 (1947).

Appellants' complaint is that the Authority, after acquiring the property, admittedly plans to resell the property to another private owner who will erect a new building on the parcel. Appellants contend that they should be allowed to keep the parcel and eliminate the substandard condition. There is no requirement any-

where in the law that a redevelopment authority must allow the owner of substandard property located in a certified blighted area to rehabilitate the property if he desires to do so rather than condemn and resell the property to another private owner.

The appellant contends that the other private owner is being given preferential treatment by the Authority. The Authority admits this, and indeed, gives reasons for its preferential treatment. In this case we have two (2) private landowners. both of whom are located in the certified blighted area. Both are going to have their property taken from them by condemnation. Under the Redevelopment Authority Disposal Plan, one of these parcels will be resold for commercial development. The Authority has given every indication that it will not favor the appellants as the buyers of this parcel even though it is the exact parcel taken from them. Rather, it has clearly indicated that it will favor the buyer who owned one of the other parcels in the certified area. The real objection of the appellants goes to whether the disposal parcel should be sold to the appellants or to the other property owner.

The Authority, in selecting the other property owner and not the appellants, has not done so by a flip of the coin. It has done so because the appellants are not entitled to the preference under the pre-existing preferential guideline standards which each redevelopment authority has.

In this case the property owner who will be preferred is Achilles Pulakos, president of Pulakos' Candies, Inc., who has been in business in the certified area for a period of almost sixty (60) years. No one disputes that the business is substantially recognized nationwide, and well-known in the Erie area. On the other hand, the appellant property owner has leased his property to various lessees. In giving preference,

the Redevelopment Authority is entitled to consider previous owners of property in the certified area. In making a comparison between previous owners the Authority is entitled to consider the exact matters that were considered in this case.

I cannot accept the implications of the majority that something sinister was occurring in this case. Prior to condemnation the Redevelopment Authority was attempting to make arrangements to relocate Pulakos' Candies, Inc. in the redevelopment area. The law of Pennsylvania specifically provides for redevelopment authorities, prior to condemnation, to plan the redevelopment proposal, including a consideration of those individuals to whom land will be disposed after the condemnation and after the public purpose has been accomplished—namely, the elimination of the blighted area. The Authority did exactly that in this case. There is absolutely no testimony in the record that any laws were violated or that any person did anything other than that which the law permitted.

There was much testimony about pressures to take care of Pulakos' Candies, Inc. in the redevelopment area. These pressures are irrelevant to any issue before us and it appears to me that it would be irrelevant even were this a matter concerning to whom the parcel of property was to be disposed—unless there was testimony that the word pressure meant some illegal act. There is absolutely no indication of that in the case before us. In fact, quite the opposite is true. Elected public officials should not ignore the pleas and plight of a citizen resident of the community who has operated a well-known business for a period of sixty (60) years. I think it would have been more reprehensible had the elected officials slammed the door in this citizen's face, unresponsive to his needs. Nor was this a case in which the Redevelopment Authority ignored all

other matters concerning the community's development for the sake of one dissatisfied property owner. I note that Pulakos went to court to attempt to stop the taking of his property. It was the Redevelopment Authority that fought Pulakos in the courtroom and finally succeeded. I note also that the record shows that after the date of the condemnation of the appellants' property, at public meetings of the Authority, arms length transactions were still continuing between the Redevelopment Authority and Pulakos. No final binding agreement between the Authority and Pulakos had been reached on the date of the condemnation of the appellant's property. Several months after the condemnation date there was still very serious disagreement as to whether or not a binding agreement would be entered into between the Redevelopment Authority and Pulakos. In fact, the record does not indicate whether there was ever a final binding legal agreement entered into between the Redevelopment Authority and Pulakos.

Pursuant to law, a public hearing was held on the reuse of the land in the certified area. After this, the plan was adopted by the City Council. The record does not show that the appellants raised any objection at the hearing before City Council. The appellants only entered objections after they learned that the Authority intended to convey the parcel in question to Pulakos, rather than to the appellants. If a condemnation can be stopped because of allegations that the *disposition* of a particular parcel will not be in conformity to law, all redevelopment projects would be threatened. I doubt if there is a redevelopment project wherein redevelopment authorities do not do exactly what the law of Pennsylvania allows them to do with specificity—namely, to negotiate and consider what developers will be put back into the project area even before any condemnation has taken place.

I can find nothing in the majority opinion which indicates that any law was broken at any time. Under the majority holding, if the condemnation of the appellants' property was not proper, neither was the condemnation of the entire property in the redevelopment area. As stated, the appellants do not contest that the area in which their property was located was a blighted area and there is substantial evidence in the record that the appellants' property was substandard. The Redevelopment Authority, not the appellants, makes decisions under the law concerning the disposal of property. Even if the proposed disposition were contrary to law, it does not affect the power to condemn for public purposes.

We might note that the activities of the Authority in attempting to satisfy Pulakos before the time of condemnation are quite similar to the activities of the Authority in trying to satisfy the potential hotel developers. Courts should not enter into aesthetic or value judgments in most cases. I cannot say that hotel rooms are preferable to well-established candy stores. I can find nothing illegal, sinister, or reprehensible in the attempt of the Redevelopment Authority to relocate a sixty (60) year old, well-established candy business in the City of Erie.

We note that at no time did the appellants contend that the Redevelopment Authority was abusing its discretion in its redevelopment proposal. Their only claim is that they should receive their own property rather than another developer. I find nothing in the law which entitles appellants to this preference. I further find nothing in the law indicating that, even were this an illegal preference, the City's power of condemnation would be affected, especially when as early as 1962, it had a public purpose to eliminate blight in a certified area and, as early as 1965, appellants' proper-

ty was determined to be substandard—both dates occurring long before any question of disposition appeared. The preliminary objections to the condemnation should be dismissed.