727 A.2d 102 (1997)
320 N.J. Super. 342
CASINO REINVESTMENT DEVELOPMENT AUTHORITY, a public corporate body of the State of New Jersey, Plaintiff,
v.
Josef BANIN and Mrs. Josef Banin, his wife; Peter Banin; Golden Island; Anatoly Kovayrenko t/a Golden Island; City of Atlantic City, Atlantic City Municipal Utilities Authority; State of New Jersey; L. Norman Markowitt and Margaret Markowitt, his wife; and Atlantic City Electric Company, Defendants.
Casino Reinvestment Development Authority, a public corporate body of the State of New Jersey, Plaintiff,
v.
Raymond Coking and Vera Coking, his wife; Barbara Torpey; Heritage Bank, N.A.; Atlantic City Medical Center; Commercial Banking Corporation; Fidelity Union Trust: Company; Atlantic City Electric Company; City of Atlantic City, Atlantic City Municipal Utilities Authority; and State of New Jersey, Defendants.
Casino Reinvestment Development Authority, a public corporate body of the State of New Jersey, Plaintiff,
v.
Vincent Sabatini and Clara Sabatini, his wife; Anna Bloh; Boardwalk Properties, Inc.; City of Atlantic City; Atlantic City Municipal Utilities Authority; State of New Jersey; and Atlantic City Electric Company, Defendants.
Superior Court of New Jersey, Law Division, Atlantic County.
Decided July 20, 1998.
*103 James Raborn, Morristown, for plaintiff (Riker, Danzig, Scherer, Hyland & Perretti, attorneys; Vincent Sharkey, of counsel).
Norman L. Zlotnick, Atlantic City, for defendant Banin (Mairone, Biel, Zlotnick & Feinberg, attorneys).
Glenn A. Zeitz, Cherry Hill, for defendant Coking.
Dana Berliner, for defendant Coking (Institute for Justice, attorneys).
James P. Savio, Absecon, for defendant Sabatini (Savio, Reynolds & Drake, attorneys).
Liane Levenson, Atlantic City, for Trump Plaza Associates (Cooper, Perskie, April, Niedelman, Wagenheim & Levenson, attorneys).
WILLIAMS, A.J.S.C.
These three cases involve a challenge to Casino Reinvestment Development Authority's (CRDA's) attempt to exercise its power of eminent domain. CRDA and Trump seek a judgment determining that CRDA is duly vested with the power of eminent domain and has appropriately exercised the power. If the court concludes that such is the case it will enter a judgment to that effect and appoint three neutral commissioners to hold hearings to determine the just compensation to which each property owner is entitled for the taking of their property.
On the other hand, the defendant property owners argue that the primary purpose of these condemnations is to achieve a private rather than a public benefit and, as such, the condemnation actions should not be permitted to proceed. If the court concludes that this is the case it will enter a judgment dismissing the cases.
In its decision on CRDA's prior motion for summary judgment the court stated the following:
Our case law is clear that property may be condemned by a public authority and transferred to a private entity provided that the condemnation is in furtherance of a valid public purpose. Wilson v. City of Long Branch, 27 N.J. 360, 376 [142 A.2d 837] (1958) (holding that a condemning authority may utilize a private corporation to produce public benefit although the corporation will benefit from the project because the acquisition is not for the use of a private corporation ... rather, such corporation is used to accomplish the public purpose); Trenton v. Lenzer [Lenzner], 16 N.J. 465, 470 [109 A.2d 409] (1954) (holding that the fact that a parking facility might ultimately be constructed or operated by a private party did not impair the City's authority to condemn an existing private parking lot for the purpose of making it available for the public parking facility); State v. Buck, 94 N.J.Super. 84, 88 [226 A.2d 840] (1967) (holding that the fact that private interests are served will not defeat condemnation proceedings because the controlling question is whether the paramount reason for taking land is in the public interest); N.J. Housing & Mortgage Finance Agency v. Moses, 215 N.J.Super. 318, 326 [521 A.2d 1307] (App.Div.1987) (holding that because the provision of non-housing support facilities is a specific objective of the Housing and Mortgage Finance Agency Law, the agency's power to condemn may be invoked for that purpose and it was permissible for the agency to condemn land for construction of a shopping center by a private corporation, which also received agency financing to purchase the condemned land in order to serve the residents of nearby publicly financed housing projects).
Where, however, a condemnation is commenced for an apparently valid public purpose, but the real purpose is otherwise, the condemnation may be set aside. Essex Fells v. Kessler Inst., 289 N.J.Super. 329, 338-339 [673 A.2d 856] (Law Div.1995); Wilmington Parking Auth. v. Land With Improvements, 521 A.2d 227 (De.1986). See also Earth Management, Inc. v. Heard County, 248 Ga. 442, 283 S.E.2d 455 (1981) (condemnation of land for a public park was subterfuge to veil real purpose of preventing construction of a hazardous waste disposal site); Carroll County v. City of Bremen, 256 Ga. 281, 347 S.E.2d 598 (1986) (condemnation for police and fire training facility voided when real purpose *104 was to prevent construction of sewage treatment plant); Pheasant Ridge Assoc. v. Burlington Town, 399 Mass. 771, 1506 [506] N.E.2d 1152 (1987) (land taking for park, recreation and moderate income housing seen as pretext to exclude low or moderate income housing); Redevelopment Auth. v. Owners or Parties in Int., 1 Pa. Cmwlth. 378, 274 A.2d 244, 247 (1971) (real reason for condemning defendants' property was to provide a new home for a new owner and not to remove a substandard building); City of Miami v. Wolfe, 150 So.2d 489 (Fla.[App.]1963) (condemnation suit was not for purpose of extending roadway, but to permit public body to acquire valuable riparian rights.); In Re Real Prop. In Inc. Vil. of Hewlett Bay Park, 48 Misc.2d 833, 265 N.Y.S.2d 1006 (N.Y.Sup.Ct.1966) (real purpose of condemnation proceeding was not to provide village storage area but to prevent construction of parking facility which village deemed undesirable).
Our Supreme Court recently took note of such in City of Atlantic City v. Cynwyd Investments, 148 N.J. 55, 73 [689 A.2d 712] (1997) in which it quoted from Wilmington Parking Auth., supra at 231:
Generally, when the exercise of eminent domain results in a substantial benefit to specific and identifiable private parties, "a court must inspect with heightened scrutiny a claim that the public interest is the predominant interest being advanced." Poletown Neighborhood Council v. City of Detroit, 410 Mich. 616, 304 N.W.2d 455, 459 (1981). In determining whether projects with substantial benefit to private parties are for a public purpose, this Court has held that the trial court must examine the "underlying purpose" of the condemning authority in proposing a project as well as the purpose of the project itself.
A careful reading of Cynwyd makes it clear that the Supreme Court was not establishing a new "heightened scrutiny" standard of review as argued by defendants. By referring to Wilmington Parking Auth., however, the Court did reaffirm the established principle that where the real purpose of the condemnation is other than the stated public purpose, the condemnation may be set aside.
At issue here is whether defendants have evidence to establish that CRDA's underlying purpose was other than to support a hotel development project as authorized by the applicable statutes and regulations. Specifically, is there evidence from which a fact-finder could reasonably conclude that CRDA's primary intent was to benefit Trump and that the hotel development project was used as a pretext to achieve that end?
Although defendants refer extensively to benefits received by Trump from these condemnations, such benefits do not necessarily lead to the conclusion that CRDA acted in bad faithusing the hotel development project rationale as a pretext. The very nature of such a project requires that a casino hotel operator receive substantial benefits. From a review of the exhibits submitted with this motion, the court does not believe that a finding could reasonably be made that CRDA's motives were other than to promote a hotel development project as authorized by law.
However, an inquiry into whether the public purpose is paramount or whether a condemnation primarily benefits a private party with only incidental public benefit need not be limited to examination of an agency's motives. A determination of whether the primary purpose of a project is public or private may also turn upon an assessment of the consequences and effects of the proposed project. Randolph v. Wilmington Housing Auth., 139 A.2d 476, 483 (Del.1958); Wilmington Parking Auth. v. Land With Improvements, supra at 232.
CRDA asserts that the following public benefits identified by the Legislature are the consequences of this project.
 the development of additional hotel rooms in Atlantic City dedicated to housing conventioneers using the new Convention Center
 redevelopment of a portion of the Corridor Area *105  the construction of additional parking
 the alleviation of traffic congestion in the Corridor Area
 establishment of a parkgreen spacein Atlantic City
 creation of new permanent hospitality industry and short-term construction industry jobs
 promotion of the tourist and convention industries
Of these consequences, however, not all are directly related to the condemnation of the specific properties involved in these cases. Those that are so related would appear to be the following:
 redevelopment of a portion of the Corridor Area
 the construction of additional parking
 the alleviation of traffic congestion in the Corridor Area
 establishment of a parkgreen spacein Atlantic City
If the consequences and effects of these condemnations are to eliminate traffic congestion, to provide for additional parking to support the hotel, to create open or green space, and by such to assist in the development of the Corridor Area, then such would justify a conclusion that the primary purpose for these condemnations is a public one even though benefit will be received by Trump.
However, defendants assert that the consequences and effects of these condemnations are quite different. As stated in their brief:
Trump maintains discretion to determine how the property will be used once title is transferred to him.... Although CRDA claims that there are adequate safeguards to prevent Trump from changing the use of the properties, ... the vague language merely states that Trump must maintain the use for a "reasonable time."
If the consequences and effects of condemning the Banin, Coking and Sabatini properties are simply to allow for the acquisition and assemblage of land by Trump for future private development purposes, then the asserted public benefits are illusory.
Put another way, if CRDA acquires these properties by condemnation and conveys them to Trump, are there sufficient assurances that Trump will be bound to use the properties for the public purposes for which they were acquired? The failure of such assurances would result in a consequence of primarily private rather than public benefit which could not justify these condemnation actions. Mayor and Aldermen of the City of Vicksburg v. C.N. Thomas, 645 So.2d 940 (Miss.1994) (upholding dismissal of condemnation proceeding because city failed to provide conditions, restrictions, or covenants in its contract with Harrahs to ensure that property would actually be used for purposes for which it was condemned.)
Since the court's prior decision, supplemental materials have been submitted and the matter now comes before the court again on CRDA's motion for summary judgment. At oral argument counsel for defendant property owners asserted that they believed their clients were entitled to summary judgment as well, but they stated that they had filed no cross motions because they wanted a trial.
Summary judgment is appropriate where there is no genuine dispute as to any material fact, thus allowing the case to be decided upon the applicable law. When deciding whether there is a genuine dispute as to a material fact, the court must consider whether the competent evidence, when viewed in a light most favorable to the non-moving party under the applicable evidentiary standard, is sufficient to permit a rational fact-finder to resolve the disputed issue in favor of the non-moving party. Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 523, 666 A.2d 146 (1995).
When the court concludes that there is no dispute as to material facts, an evidentiary hearing serves no useful purpose. Even though no cross motions have been filed by the defendant property owners, counsel for CRDA and Trump Plaza Associates (Trump) have asserted that there now are no material *106 facts in dispute and have invited the court to act sua sponte to decide these cases as a matter of law as if cross motions had been filed.
The court accepts that invitation, because it is now satisfied that there are no disputed issues with regard to material facts and that these matters may be resolved on the applicable law.
The court incorporates its prior opinion of May 20, 1998, and the factual history therein and concludes that for purposes of this decision the following material facts are not disputed.
On June 11, 1993, Trump submitted an application to CRDA for a determination that it was eligible for investment tax credits for a proposed $28.6 million hotel redevelopment project. Trump's project called for the redevelopment of the city block abutting the boardwalk between the Trump Plaza Hotel-Casino and Caesars Hotel-Casino. The block was located in the Corridor Area which was an area previously identified by CRDA for redevelopment. The site was occupied by the former Holiday Inn Hotel, the rusting steel structure of the aborted Penthouse Hotel-Casino project, some undeveloped lots and a few private residences and small businesses. Included within the site were the properties of defendants Banin, Coking and Sabatini.
Trump's project proposed creation of a 361-room hotel by rehabilitation of the Holiday Inn building; removal of the dilapidated Penthouse steel structure; construction of surface parking and a driveway bisecting the block from Missouri Avenue to the entrance of the Trump Plaza Hotel; and creation of a park or privately-owned landscaped area along Pacific Avenue. The project also called for construction of a two-story porte-cochere at the Trump Plaza entrance spanning Columbia Place, the public street between Trump Plaza and the site, as well as linkage of the renovated hotel to Trump Plaza by way of a sky bridge over Columbia Place near the Boardwalk. The project was to be completed in two phases.
Trump already controlled most of the land required for the project through a lease with option to buy from Midlantic Bank. However, parcels in the area proposed for the driveway, surface parking, and the landscaped park area were held by other owners. Because Trump had previously been unable to acquire these privately-owned parcels, CRDA was requested to use its power of eminent domain for their acquisition.
On July 13, 1993, CRDA adopted a resolution preliminarily determining that Trump's project was eligible for approval. A public hearing on the project was conducted on July 30, and thereafter CRDA adopted Resolution 93-69 approving eligibility and tax credits for the first phase of the project. The first phase involved demolition of the existing Penthouse structure. A Credit Agreement setting forth certain rights and responsibilities of each party was executed by CRDA and Trump on August 23, 1993.
On September 28, 1993, Resolution 93-81 approving the second phase of the project was adopted. The second phase involved redevelopment of the Holiday Inn structure and development of appurtenant facilities. CRDA then entered into an amendment of the credit agreement (first amended credit agreement). Neither Resolutions 93-69 or 93-81 nor the credit agreement or its first amendment made any explicit reference to acquiring property by eminent domain and conveying same to Trump although CRDA's internal memos and the public hearing indicated that such was proposed for the project.
The first amended credit agreement added an article not contained in the original credit agreement, headed "Representations, Warranties and Covenants." Section 3.2.1 of that article provided:
Trump Plaza hereby agrees that it will comply with all provisions of the Act and the Rules relating to the development of the Project and the use thereof, including, more particularly and without limitations, these provisions relating to (i) the scope of what constitutes Hotel Development Projects including appurtenant facilities thereto, (ii) the timing for receipt of financing commitments to provide for the payment of Development Costs in excess of the Project Allocation, (iii) the establishment of a development schedule to satisfy the *107 time restrictions set forth in the Act and the Rules, and (iv) the restrictions on use by Trump Plaza of the completed units.
On November 9, 1993, CRDA passed Resolution 93-97 which authorized the Executive Director to initiate appraisal services and an environmental site audit for certain "out-parcels" in the project area in order to pursue their acquisition either through negotiated purchase or utilization of the Authority's power of eminent domain. The "out-parcels" included defendants' properties.
The Resolution noted that:
[T]he Authority has entered into a Credit Agreement with the Applicant which agreement must be supplemented to insure that the Authority is compensated for all costs associated with the acquisition of property in the Project Area whether through negotiated purchase or utilization of the Authority's power of eminent domain.
As a result, the Resolution provided, among other things:
Section 2. The Authority hereby authorizes the Executive Director to negotiate, supplement and execute the credit agreement to provide reimbursement, credit or other payment from the Applicant to the Authority for expenses undertaken in the acquisition of required parcels in Block 38 whether through negotiated purchase or utilization of the Authority's power of eminent domain.
Thereafter CRDA attempted to acquire the outstanding parcels on the project site through negotiations. When offers to purchase were not accepted, these three condemnation actions were initiated in July of 1994.
By the fall of 1994, the defendant property owners had filed responses with the court objecting to CRDA's condemnation efforts on various grounds.
In January 1995, CRDA and Trump entered into a second amended credit agreement which was contemplated in Resolution 93-97. Although entered into in January 1995, the amendment was dated "as of November 10, 1993," the day after Resolution 93-97 was adopted. CRDA has acknowledged that there was no further resolution adopted by its board explicitly authorizing the various provisions contained in the second amended credit agreement. The second amended credit agreement contained substantial provisions not included in prior agreements. It explicitly addressed the issue of property acquisition by adding a new Article III bearing the heading "Property Acquisition." The old Article III headed "Representations, Warranties and Covenants" was revised and renumbered as Article IV.
In the second amended credit agreement CRDA for the first time explicitly identified defendants' properties (in its definition of the term "parcel") and for the first time committed itself to acquire these parcels by purchase, eminent domain or any other legally available means (Section 3.1.1), and to thereafter convey said parcels to Trump (Section 3.4). It also addressed issues concerning reimbursement from Trump for expenses involved in the acquisition process as well as other unresolved matters necessary for the acquisition and conveyance process to proceed. Prior to the execution of the second amended credit agreement there was no assurance that CRDA would be compensated for all costs associated with acquisition of these properties as was required by Resolution 93-97.
In the renumbered Article IV on "Representations, Warranties and Covenants" under Section 4.2.1 CRDA included the section previously numbered 3.2.1 and added the following language.
In addition, Trump Plaza agrees that the Parcels, for such reasonable period of time as shall be reasonably determined by the CRDA and consistent with the requirements of law, will be used for purposes as a Hotel Development Project, including appurtenant facilities (as referred to in the CRDA Act).
Although this court previously raised a question as to what the parties considered to be a "reasonable period of time", CRDA and Trump have now acknowledged that neither of their representatives had a specific time in mind. They assert that interpretation of the *108 phrase "reasonable period of time" is to be determined by CRDA if necessary at some future date, subject to challenge only if CRDA is not reasonable in its determination.
CRDA also points out that it has placed specific time restrictions in deeds subsequently issued and asserts that it will do the same in these cases when and if it conveys these parcels to Trump. That language in pertinent part provides as follows:
The Premises shall hereby be made and declared to be used only for the types of purposes, projects, facilities, or uses and subject to the conditions and covenants set forth on Schedule "A" which is made a part hereof.
* * * * * *
The restrictions and covenants imposed with this Declaration shall be binding upon the Declarant and its agents, personal representatives, assigns and all other successors in interest, and shall continue as a servitude running with the Premises for a period of thirty (30) years from February 1, 1996 and shall expire on January 31, 2026.
Schedule A provides:
Title to the Premises shall be subject to the following restrictions, covenants and conditions. The Premises shall only be used for a hotel development project including construction, reconstruction or rehabilitation of hotel rooms, or "appurtenant facilities" within the meaning of N.J.S.A. 5:12-173.8 or the regulations promulgated thereunder.
The question before the court is whether, on these facts, there are sufficient assurances that the properties to be condemned will be used for the public purposes cited to justify their acquisition.
This requires that we first look at those purposes. As noted, CRDA approved this project in two phases. Phase one which involved demolition of the old Penthouse structure was approved by Resolution 93-69. In that resolution "the Project" was explicitly defined as "the construction of 361 hotel units by virtue of the rehabilitation of the existing Holiday Inn building and the development of a park and parking area "(emphasis added). The identical description was included in Resolution 93-81 and the credit agreement and in each amendment thereafter.
"The Project" was determined to be eligible for approval because at that time it fit within the broad definition of a hotel development project and appurtenant facilities found in CRDA's regulations. N.J.A.C. 19:65-1.2.
As the court previously concluded, CRDA in the exercise of its discretion approved inclusion of defendants' properties within "the Project" because they supported the renovated hotel by providing parking and open space and contributed as well to the enhancement of the corridor region through easing traffic congestion and providing green space and esthetic benefits.
These then represent the public purposes cited by CRDA to justify including the defendants' properties within "the Project" and to justify their acquisition by CRDA through exercise of the power of eminent domain.
While CRDA asserts that the properties are to be acquired for purposes of a "hotel development project and appurtenant facilities," the court finds such a rationale to be overbroad. The properties are not to be acquired for simply any hotel development project. They are to be acquired for a specific hotel development project, which calls not only for "construction of 361 hotel units by virtue of the rehabilitation of the existing Holiday Inn building," but the "development of a park and parking area" as well. It is this project at the time it was submitted for approval, and only this project, which CRDA has concluded meets the statutory requirements and is in the public interest.
To determine whether there are adequate assurances that the properties in question will be used substantially for the purposes cited to justify their acquisition, the court must look next to the credit agreement.
This court notes that the covenants of section 3.2.1 of the first amended credit agreement refer to the development and use of "the Project." The word Project is capitalized and the agreement specifically defines *109 the term in Article I Section 1.1 as having the following definition:
[T]he construction of 361 hotel units by virtue of the rehabilitation of the existing Holiday Inn building and the development of a park and parking area (emphasis added).
The pertinent part of section 3.2.1 reads as follows:
Trump Plaza hereby agrees that it will comply with all provisions of the Act and the Rules relating to the development of the Project and the use thereof, including, more particularly and without limitations, these provisions relating to (i) the scope of what constitutes Hotel Development Projects including appurtenant facilities thereto.
At the outset it is not clear that the provisions even relate to defendants' properties since neither the credit agreement, its first amendment or the resolutions approving same make any explicit reference to defendants' properties, their acquisition by eminent domain, or their subsequent conveyance to Trump. While Resolution 93-97, adopted after execution of the first amended credit agreement, does refer to acquisition of properties through negotiated purchase or CRDA's exercise of the power of eminent domain, it also contemplates that various financial assurances would be in place between CRDA and Trump before the agency would proceed. Those assurances explicitly relating to defendants' properties appear for the first time in the second amended credit agreement which was executed well after these condemnation actions had been initiated. The court notes that a question may exist as to whether the CRDA Board ever formally authorized these eminent domain actions. None of the material submitted to the court contains any resolution explicitly authorizing such. Resolution 93-97, adopted after execution of the first amended credit agreement, refers for the first time to eminent domain but only deals with preliminary steps in the process. However, that issue has not been argued by defendants and accordingly will not be addressed by the court. For purposes of this decision, the court will read section 3.2.1 as applying both to the properties to be acquired by condemnation as well as to that property already owned or controlled by Trump.
The court notes that even if section 3.2.1 is construed so as to apply to the use of defendants' properties by Trump, there is no time period established for any restrictions or conditions imposed on their use. Thus, under the first amended credit agreement, nothing explicitly prevents Trump from changing the use of the properties at any point it might choose after acquisition. The parties evidently recognized both the lack of reference to acquisition of defendants' properties by eminent domain and the lack of any time period for conditions placed on use of the properties when they executed the second amended credit agreement. That amendment, as we now know, was not executed until after these condemnation actions were initiated and defenses were raised by the property owners. While CRDA asserts that the court should give retroactive effect to the requirement that Trump Plaza be restricted in use of the parcels "for such reasonable period of time as shall be reasonably determined by the CRDA"the court declines to do so. The issue before the court is whether there was a valid public purpose justifying acquisition of the properties when the condemnation actions were initiated. If, on that date, the primary benefit was a private rather than public one, then the condemnation actions should be dismissed. If the public agency and private entrepreneur choose to renegotiate or restructure their agreement thereafter, they are free to do so and are free to pursue new eminent domain actions at that time. While dating an agreement executed in January 1995, "as of November 10, 1993" may be binding as to CRDA and Trump, it should not be permitted to affect the rights of other parties and this court will not allow such to occur.
Even if the second amended credit agreement were to be applied retroactively, the court would still conclude that these condemnation actions should not be permitted to proceed.
This project did not begin as many redevelopment projects do, with the public agency identifying and putting together an assemblage *110 of land in order to attract a developer. This was a project proposed by Trump Plaza where Trump Plaza already owned or controlled most of the land. With the exception of a new driveway which did not involve these properties, all of the significant construction was to occur on the land already owned or controlled by Trump. The parcels owned by the defendants were in use as a residence by Coking and as active businesses by Banin and Sabatini. The plans which justified including defendants' properties in this project and subjecting them to the power of eminent domain called for the most minimal development possible. Coking's property to be blacktopped and used for surface parking and Banin and Sabatini's properties would be planted with grass and used for a park or green space.
CRDA has not suggested that the reason for acquiring these properties is to facilitate an assemblage of real estate by Trump for future casino hotel expansion in its discretion at some unspecified future date. Such a purpose could not rationally be justified as a public purpose. Yet as CRDA and Trump construe the credit agreement and its amendments, that is exactly the consequence and effect of their actions. As is indicated in the second amendment to the credit agreement and as stated at oral argument, Trump is not required to use defendants' properties solely for the purposes of this "Project." Rather it may use these properties for any purposes so long as these purposes fit within the definition of a "hotel development project and appurtenant facilities." Thus if Trump were to decide tomorrow, next year or 20 years from now to eliminate the park and fill the entire block with an expanded casino hotel it would be permitted to do so and could do so without CRDA approval. That this possibility has at least been considered by Trump is shown by its concern to guarantee air space development rights for properties already acquired.
This project was approved pursuant to N.J.S.A. 5:12-173.1-8 in which the Legislature sought to encourage the construction of additional hotel rooms in Atlantic City to support the new convention center. Toward that end the Legislature directed CRDA to make $100,000,000 in funds available. It later amended the Act to provide for an additional $75,000,000 in funding. The emphasis, however, was on the immediate development of hotel rooms because of the anticipated opening of the new convention center in 1998. Thus if applications for new projects were not submitted within 90 days of September 16, 1996, the proposed project would be too late to respond to the Legislative concern underlying N.J.S.A. 5:12-173.1-8 and could not be approved as a hotel development project. Where the proposed hotel development was beyond the deadline of N.J.S.A. 5:12-173.8, CRDA could not exercise its power of condemnation in support of such a project. Yet by condemning property now for minimal surface development and allowing Trump to use that land to expand its casino hotel at a future time of its choosing, CRDA has in effect achieved a result not sanctioned by the Legislature.
In one case here, CRDA is acquiring a person's home in order to convey the land to Trump for surface parking. In the other two cases it is extinguishing two ongoing businesses each of which benefits from its location by acquiring and conveying land to Trump for green space. As this court noted in its decision of May 20, a determination by CRDA that such uses fulfilled a public purpose could only be set aside by the court if it was arbitrary, unreasonable or a perversion of governmental power. State v. Lanza, 27 N.J. 516, 530, 143 A.2d 571 (1958). The court concluded that such had not been demonstrated by the defendant property owners. If these properties were to continue to be used for these purposes by Trump, this court would have no difficulty in sustaining these condemnation actions.
But that is not what is assured here because Trump is not bound to use these properties for those purposes. In this case a public agency, through the power of eminent domain, if successful, will have effectively created an assemblage of land for future development by Trump under circumstances where CRDA could not do so under N.J.S.A. 5:12-173.1-8 and where Trump is unable or unwilling to do so itself on the open market. When, how, and if the property is developed *111 in the future will be outside the control of CRDA except for the fact that Trump, a casino hotel operator, will have to develop and use the property consistent with the business in which it is already engaged.
In looking at the consequences and effects of these condemnation actions the court must conclude that under the circumstances present here, any potential public benefit is overwhelmed by the private benefit received by Trump in the form of assemblage and future control over development and use of parcels of prime real estate in Atlantic City.
CRDA and Trump assert that even if CRDA could no longer approve a hotel development project under N.J.S.A. 5:12-173.1-8, such does not mean that CRDA support of future hotel development is necessarily precluded. CRDA points to the history of legislative concern for development of hotel rooms when there were insufficient numbers of rooms to support Atlantic City's tourism and convention industry. The court recognizes that there may be cases now and in the future where an insufficiency of adequate hotel rooms might create a justifiable public purpose permitting CRDA to support hotel development through the use of eminent domain. Those cases will arise, however, when CRDA has a specific proposal before it and can evaluate the proposal in light of the public interest at the time the proposal is made. Such a circumstance is quite different from that existing in this case. What has occurred here is analogous to giving Trump a blank check with respect to future development on the property for casino hotel purposes.
Finally, the court recognizes a body of case law which stands for the proposition that where a public agency acquires property by eminent domain it may thereafter put that property to a public use other than that for which it was initially acquired. Such cases can and should be distinguished from those situations where the public agency acquires the property for purposes of conveying it to a private developer. In the former case the public agency is making the decision and still committing the property to a public use. In the latter situation, absent appropriate restrictions in the agreement between the public agency and the private developer, there are no assurances that the public interest will be protected.
For the reasons stated, when the court considers the consequences and effects of these three condemnation actions it must conclude that the primary interest served here is a private rather than a public one and as such the actions cannot be justified under the law. Accordingly a judgment shall be entered dismissing the actions.