689 A.2d 712

THE CITY OF ATLANTIC CITY, A MUNICIPAL CORPORATION, PLAINTIFF–RESPONDENT, v. CYNWYD INVESTMENTS, A PENNSYLVANIA PARTNERSHIP AND GREATE BAY HOTEL AND CASINO, INC., T/A SANDS HOTEL & CASINO, A NEW JERSEY CORPORATION, DEFENDANTS–RESPONDENTS, AND CORRESTATES NJ NATIONAL BANK, ATLANTIC CITY ELECTRIC COMPANY, T/A AS ATLANTIC ELECTRIC, A NEW JERSEY CORPORATION, AND THE STATE OF NEW JERSEY, DEFENDANTS, AND BOARDWALK REGENCY CORPORATION, A NEW JERSEY CORPORATION, AND SQUARE BRIGHTON CORPORATION, INC., A NEW JERSEY CORPORATION, DEFENDANTS–APPELLANTS.

SQUARE BRIGHTON CORPORATION, INC. A NEW JERSEY CORPORATION AND FLOYD JAMES, A TAXPAYER OF ATLANTIC CITY, PLAINTIFFS–APPELLANTS, v. THE CITY OF ATLANTIC CITY, A MUNICIPAL CORPORATION AND BODY POLITIC OF THE STATE OF NEW JERSEY, GREATE BAY HOTEL AND CASINO, INC., T/A "SANDS HOTEL & CASINO", A NEW JERSEY CORPORATION, CYNWYD INVESTMENTS, DEFENDANTS–RESPONDENTS, AND BOARDWALK REGENCY CORPORATION, A NEW JERSEY CORPORATION, DEFENDANT.

Argued November 18, 1996—Decided March 10, 1997.

*Gerard W. Quinn* argued the cause for appellant Boardwalk Regency Corporation, etc. (*Cooper Perskie April Niedelman Wagenheim & Levenson,* attorneys; *Mr. Quinn* and *Lloyd D. Levenson,* on the briefs).

*Edward N. FitzPatrick* argued the cause for appellant Square Brighton Corporation, Inc., etc., et al. (*DeCotiis, FitzPatrick & Gluck* and *McGahn & Friss;* attorneys; *Mr. FitzPatrick* and *Patrick T. McGahn, Jr.,* of counsel; *Mr. FitzPatrick, Mr. McGahn, Raymond S. Papperman* and *Agnes I. Rymer,* on the briefs).

*Daniel A. Corey,* City Solicitor, argued the cause for respondent City of Atlantic City, etc. (*Mr. Corey* and *John M. Eccles, Jr.,* on the briefs).

*John H. Rosenberger* argued the cause for respondent Cynwyd Investments, etc. (*Perillo & Rosenberger,* attorneys).

*Stephen R. Nehmad* argued the cause for respondent Greate Bay Hotel and Casino, Inc., etc. (*Perskie & Nehmad,* attorneys;

*Mr. Nehmad, Frederick H. Kraus* and *Richard F. DeLucry,* on the brief).

The opinion of the Court was delivered by

O'HERN, J.

These appeals concern the validity of an acquisition of land by Atlantic City. (For convenience, we refer to the two appeals as one case.) The acquisition had the effect of creating a widened roadway that provides access to casino-related properties. There are two issues: (1) whether the ordinance authorizing the acquisition of the land with funds provided by an adjoining property owner complies with the Local Budget Law, *N.J.S.A.* 40A:4–57; and (2) whether the requirements under the Eminent Domain Act, *N.J.S.A.* 20:3–6, for the City to have obtained an appraisal before condemnation and to have made an offer to acquire the land for the appraisal price, may be waived by the record owner of the property. At first glance it appeared that the City was playing favorites with parties having an interest in these boardwalk-related properties. On closer analysis, the City appears simply to have been engaged in an attempt to extricate itself from an imperfect effort to provide, through municipal planning, improved motor-vehicle access for properties to be used for casino development. We affirm the judgment of the Appellate Division upholding the municipal actions.

## I

The case has its inception in the heady days of real estate development following the adoption of the 1976 constitutional amendment authorizing casino gambling in Atlantic City. The familiar board game, "Monopoly," uses the street names of Atlantic City to illustrate how some properties, by virtue of location, may have greater value than others. We deal with two parcels of land in the Park Place area of Atlantic City that were acquired for possible casino development. Because the case arises on motions

for summary judgment, we accept the facts in the light most favorable to the aggrieved parties.

The defendant, Greate Bay Hotel & Casino, Inc. (Sands) was the first to develop a casino on one of the properties. In 1979, the Atlantic City Planning Board required Sands, as a condition of development, to dedicate a portion of its land to form half of what became known as Pop Lloyd Boulevard. But for such a road, traffic would reach a dead-end at the Boardwalk; there was no way for traffic to circulate. Pop Lloyd Boulevard was to be a north-south road parallel to the boardwalk between Indiana Avenue and Martin Luther King Boulevard.

The Planning Board required Sands to position its loading docks on the Pop Lloyd side of its property and to route its bus and patron traffic by way of the new road to the Sands' front door. The adjoining parcel to the east, the former site of the Traymore Hotel, was owned by Cynwyd Investments. Cynwyd had given a ninety-nine-year lease (with an option to purchase) to Boardwalk Regency Corporation (otherwise known as Caesars). Caesars proposed building a casino-hotel on the Traymore site. The Planning Board also required Caesars, as a condition of its development approvals, to dedicate land to make up the other half of Pop Lloyd Boulevard. The location of the properties is shown on the sketch below:

Although Caesars obtained its land use approvals in 1979, it gave up plans for a casino on the Traymore site and never dedicated the strip of land for use as a street. Caesars then subleased the Traymore site to Square Brighton Corporation, Inc. (Square), for use as a parking lot. Pop Lloyd Boulevard, however,

was constructed as planned, as a paved road approximately 30 feet wide, half on land owned by Sands and half on the Traymore land.

When Square discovered that its sublease included one-half of Pop Lloyd Boulevard, it put a fence down the middle of the street, preventing the use of Sands' loading dock. At first the City leased the other half of the road. When the City would no longer do so, to gain vehicular access to its loading dock and front door, Sands had to rent the 16–foot strip of Pop Lloyd Boulevard (the Property) held by Square.

In 1991, after years of off-and-on litigation and discussion, Sands sued the City, Cynwyd, Caesars, and Square to compel the City to acquire the Property by eminent domain or to pay damages to Sands for the effect on its property. At the end of trial in 1994, Sands and the City entered into a settlement (referred to as the Stipulation) under which the City agreed to acquire the other half of the road for public right-of-way purposes, either by purchase or by eminent domain. Sands agreed to pay one-hundred percent of the fair market value "compensation" as defined by *N.J.S.A.* 20:3–2 (the Eminent Domain Act), plus all associated costs paid by the City to acquire the Property.[1] Atlantic City Ordinance # 61–1994 (Ordinance 61) authorized the implementation of the Stipulation and the acquisition of the Property by condemnation if necessary.

The varied property interests in the Traymore Strip have caused the current complications. Under Caesars' lease with Cynwyd, if a portion of the Property were taken by eminent domain Caesars would be entitled to a reduction in rent or its option price if payments for that partial taking were in excess of $1 million. The City negotiated an acquisition price of $625,000 with Cynwyd despite having an appraisal in its files that valued

---

[1] After the settlement, the court entered judgment on other issues in the suit. The court required Sands to pay Square $562,833.34 in back rent for the Property and to continue paying Square $22,926.67 per month for the rental of the Property.

the Property at $1,122,400 for tax purposes. This alleged under-payment would have had a devastating effect upon Caesars. Under a formula for abatements in its lease, if the payment for a taking were $1,122,000, Caesars would be entitled to a yearly rent abatement of $75,546 of the $875,000 then current annual rent paid by Caesars to Cynwyd. Because the lease provided for a gradual-ly increasing amount of rent during the ninety-nine year term, the total loss to Caesars could have amounted to more than $7,786,000.

In addition, the then-current option price of $13,000,000 would be reduced by $1,122,400 to $11,877,600, some 8.634 percent. However, if Cynwyd and Atlantic City were allowed to agree to $625,000 as the total "compensation" to be improperly paid to Cynwyd in condemnation, a figure which is alleged to be about half of the City's own appraised value of the Property, Caesars would lose the use of the Property being condemned, with no rental or option price abatement at all under the terms of the lease.

Under Square's sublease from Caesars, Square was not entitled to any portion of the proceeds of a condemnation award, but was entitled to a rent abatement for any portion of the Property taken. Square would, however, lose its right to charge Sands a market rental for the Property. If the City were able to take short cuts in acquiring the Property, rather than to turn the "square cor-ners" required of government, *W.V. Pangborne & Co., Inc. v. New Jersey Dep't of Transp.*, 116 *N.J.* 543, 561, 562 *A.*2d 222 (1989), Square would lose those valuable rental rights.

Both Square and Caesars challenged the taking, claiming in separate actions primarily that Ordinance 61 was invalid and that Atlantic City had not complied, in the condemnation action, with the requirements of the Eminent Domain Act. The trial courts and the Appellate Division found that the ordinance was valid, and that Atlantic City had not violated the Eminent Domain Act because the owner of the Property had waived compliance with its require-ments. We granted certification to review the petitions of Square and Caesars. 145 *N.J.* 373, 678 *A.*2d 713 (1996).

## II

### Ordinance 61 and the Local Budget Law, *N.J.S.A.* 40A:4–57

#### A.

The City adopted Ordinance 61 on August 31, 1994, after a public hearing at which Square objected to its passage. Ordinance 61 directed the City to take the necessary action to acquire the Property either by transaction or eminent domain. Section 3 of the ordinance stated that because all funds for the acquisition of the Property would be provided by Sands pursuant to the settlement, "no certification of funds is required." Accordingly, the ordinance made no appropriation of funds for the acquisition of the Property.

Square challenged Ordinance 61 and the contract that it approved as in violation of the Local Budget Law. Because the ordinance obliged the City to acquire real property without appropriating funds for the costs of acquisition, Square argued that the ordinance is void as an authorization of an expenditure without an appropriation. The ordinance and the contract it authorized did not specify the amount of the municipal obligation that it created; it recited that the City would receive monies to cover its costs from Sands in an undetermined amount, at an unspecified future date.

The Local Budget Law provides:

> No officer, board, body or commission shall, during any fiscal year, expend any money (except to pay notes, bonds or interest thereon), incur any liability, or enter into any contract which by its terms involves the expenditure of money for any purpose for which no appropriation is provided, or in excess of the amount appropriated for such purpose.
>
> Any contract made in violation hereof shall be null and void, and no money shall be paid thereon.
>
> [*N.J.S.A.* 40A:4–57.]

A corresponding statute imposes criminal liability upon a public official who purposely and knowingly "[d]isburses, orders or votes for the disbursement of public moneys, in excess of the appropriation. . . ." *N.J.S.A.* 2C:30–4a.

Sands countered that the Local Budget Law did not apply because there was no expenditure of public funds involved. The trial court disagreed that this was an entire answer, but ruled that the City was not required to budget and appropriate funds for the land acquisition in 1994 because the City would not, under any circumstances, spend any funds in 1994, and that the City could save Ordinance 61 by budgeting and appropriating funds in its 1995 budget and expending the funds only in 1995. The Appellate Division disagreed that a public body may first incur an obligation and then fund it. 287 *N.J.Super.* 450, 458, 671 *A.*2d 203. It reasoned that when uncertainty exists following the adoption of an ordinance, concerning the source of the municipal funds necessary to accomplish an obligation incurred under the ordinance, a municipality could be said to have acted in a "fiscally irresponsible manner." *Ibid.* However, when a public body is not obliged to spend its own funds, or incur liability pursuant to an acquisition, the Local Budget Law is not violated. *Id.* at 455, 671 *A.*2d 203. Because the Stipulation expressly stated that Sands, a private party, was providing the funds, the Appellate Division held that the purpose of the Local Budget Law was not frustrated, as the ultimate goal of financial responsibility was served. *Id.* at 458–59, 671 *A.*2d 203. In addition, the court observed that the funds were in essence a conditional gift to the City. *Id.* at 458, 671 *A.*2d 203. A municipality is authorized to accept and expend conditional gifts. *N.J.S.A.* 40A:5–29.

## B.

The Local Budget Law regulates the budget-making process for all counties and municipalities in the State. *N.J.S.A.* 40A:4–21 to –45. All budgets must be prepared on a cash basis unless otherwise permitted by law. *N.J.S.A.* 40A:4–3. This insures that, absent unforeseen emergencies, local governments will pay for the expenses they incur with cash actually collected or received during the fiscal year. The purpose of the law is to require local governments to follow sound business principles in

their budgetary practices. It aims to insure that anticipated revenues equal expenditures, *State v. Boncelet*, 107 *N.J.Super.* 444, 450, 258 *A.*2d 894 (App.Div.1969), and to prohibit deficit financing. *Mount Laurel Township v. Local Finance Bd.*, 166 *N.J.Super.* 254, 257, 399 *A.*2d 982 (App.Div.1978), *aff'd*, 79 *N.J.* 397, 399 *A.*2d 980 (1979).

> The purposes of local budgetary requirements are to inculcate sound business principles and practices into municipal economic administration, with particular reference to the avoidance of waste, extravagance and ill-considered expenditures, as well as to give the members of the taxpaying public a better understanding of the financial affairs of the municipality.
>
> [*Kotlikoff v. Township of Pennsauken*, 131 *N.J.Super.* 590, 595, 331 *A.*2d 42 (Law Div.1974).]

As the trial court found, each of these purposes was addressed by the adoption of the Stipulation and Ordinance 61 to implement it. The public was given every opportunity to have a "better understanding" whether the expenditures were "ill considered" or a sign of "extravagance." *Kotlikoff*, 131 *N.J.Super.* at 595, 331 *A.*2d 42.

■ The trial court found that the Stipulation between the City and Sands, settling lengthy litigation, served not only the goals of the Local Budget Law, but also the overriding public policy goal of providing a major public benefit at no cost to the taxpayers. Ordinance 61 and the Stipulation obligated Sands to finance the City's formal acquisition of a portion of Pop Lloyd Boulevard as a public right-of-way. The City deemed the acquisition of the Property to be for a lawful public purpose, and that determination has not been put in issue. *See New Jersey Housing & Mortgage Fin. Agency v. Moses*, 215 *N.J.Super.* 318, 326, 521 *A.*2d 1307 (App.Div.), *certif. denied*, 107 *N.J.* 638, 527 *A.*2d 460 (1987) (holding that condemnation power may not be used for private purpose). We are informed that opportunity to discover any ulterior motivation was allowed but not pursued.

■ The common thread running through the cases like *Mount Laurel Township, supra*, 166 *N.J.Super.* 254, 399 *A.*2d 982, is that the municipality had incurred actual obligations (there to pay its

lawyers) without the present ability to meet them. Such cases differ from the City's obligation under the Stipulation. It incurred no expenses unless the expenditure was pre-funded by Sands. Section 3 of the Ordinance reads: "Pursuant to the terms of the Stipulation, all funds for the acquisition ... shall be provided by Sands and therefore no certification of funds is required." Sands argues that Ordinance 61 obligated it to pay "up-front," and not to simply reimburse the City at some future time. This happened when Sands deposited the funds for the acquisition with the City before the City filed its Declaration of Taking. Of course, there remained the possibility that the actual value determined in the condemnation might exceed the deposit but the trial court found, and we agree, that "sound business principles," *Kotlikoff, supra* 131 *N.J.Super.* at 595, 331 *A.*2d 42, preceded the decision to acquire the property. It often happens that a municipality may acquire lands or incur obligations without the use of taxpayer funds. Familiar examples are the use of Green Acre funds to acquire park lands or state or federal funds to construct a sewage treatment plant. We do not assume that the Local Budget Law would, in every instance, preclude a municipality from incurring an obligation before the grant funds are received. The contracts may contain any necessary provision for contingent receipt of funds. We would be more concerned about an action to acquire lands without presently available funds were it not for the enforceable Stipulation and the concurrent judicial supervision of the obligations of Sands. The only risk was the bankruptcy of Sands between the time of Declaration of Taking and any later award of commissioners or jury. We thus agree with the courts below that the Local Budget Law was not violated in these circumstances.

## III

### Section 6 of the Eminent Domain Act.

#### A.

Before the City instituted the condemnation action pursuant to Ordinance 61, it negotiated with Cynwyd and its counsel for the

purchase of the Property. No new appraisals were commissioned by the City. But, because Cynwyd participated in the tax appeal by Caesars on the Traymore site, Cynwyd was aware of the appraisals done for purposes of that appeal, specifically that the City had valued the Traymore site at a square-foot price that gave the Property a value in excess of $1,000,000. Notwithstanding that knowledge, the City and Cynwyd entered into an "Agreement as to Compensation," setting $625,000 as fair compensation for the Property. That agreement provided that the amount paid for the Property would "not be evidential or used as an indicia of value in any tax appeal on any property located in Atlantic City." Cynwyd, however, could not deliver an unencumbered title. Therefore, the City had to institute condemnation proceedings under the Eminent Domain Act, *N.J.S.A.* 20:3–1 to –50.

The Eminent Domain Act provides uniform procedures to be applied to ensure that these constitutional requisites are met and to "increase protection to the citizen whose property is condemned." *County of Monmouth v. Wissell,* 68 *N.J.* 35, 40, 342 *A.*2d 199 (1975) (quoting Governor Cahill). *N.J.S.A.* 20:3–6 requires that the condemnor conduct "bona fide negotiations with the prospective condemnee" before any condemnation action under the Eminent Domain Act may be instituted. Before any offer may be made to the condemnee, "the taking agency shall appraise said property." No "offer [shall] be less than the taking agency's approved appraisal of the fair market value of such property." *Ibid.* Our *Rule* 4:73–1 tracks these statutory requirements for the institution of condemnation proceedings. *Rule* 4:73–1 requires that the condemnation complaint also include the amount of compensation offered and a "reasonable disclosure" of the way in which that amount is calculated. Under *Rule* 4:73–1, "reasonable disclosure" includes making "a statement of the full fair market value including a description of the appraisal valuation method or methods relied upon as well as a breakdown of the appraised value allocated to the land to be acquired." These requirements were not followed.

Caesars and Square argue that these deficiencies entirely invalidate the proposed condemnation because the initial offer that the City could have made to Cynwyd could in no event be less than the City's approved appraisal of the fair market value of the Property. They argue that Sands and Cynwyd used the condemnation statutes purely for their own purpose. By distorting the appraisal process and giving up at least $497,000 now, Cynwyd stood to gain approximately $7,300,000 in rent at the expense of Caesars. In addition, with the taking of the Property, Square threatened to pay Caesars $23,000 less per month in rent, an additional annual loss of $276,000. This, Caesars argued, explained why that transaction had been given the outer appearance of a condemnation when it otherwise bears every indicium of a voluntary sale.

These were provocative concerns. As it turns out, some of the potential damages have been mitigated by virtue of the fact that Caesars has acquired the Property under its option to purchase from Cynwyd and would not be obliged to pay the extra $7,000,000 in rental over the life of the lease. Nonetheless, Caesars can sustain significant losses in its option price or the rentals between the Declaration of taking and the exercise of the option. Square stands to lose its right to the rental income. The issues are of genuine concern.

### B.

■ We agree that the pre-condemnation requirements of *N.J.S.A.* 20:3–6 to perform an appraisal and submit that appraisal to the condemnee cannot be dispensed with over the objection of a condemnee. *Borough of Rockaway v. Donofrio*, 186 *N.J.Super.* 344, 354, 452 *A.2d* 694 (App.Div.1982). In *Monmouth County v. Whispering Woods at Bamm Hollow, Inc.*, 222 *N.J.Super.* 1, 535 *A.2d* 968 (App.Div.1987), *certif. denied*, 110 *N.J.* 175, 540 *A.2d* 173 (1988), the Appellate Division dismissed a complaint in condemnation because of the county's failure to supply the condemnees with an appraisal, even though an appraisal had, in fact, been per-

formed. However, it has been held that these requirements may be waived by a condemnee. *Township of Millburn v. Pitt,* 68 *N.J.* 424, 346 *A.*2d 601 (1975). The question is, who is a condemnee? *N.J.S.A.* 20:3-2(c) defines a condemnee as "the owner of *an* interest in the private property being condemned for a public purpose under the power of eminent domain." (Emphasis added.) At stake is whether Section 6 protects not only the record owners, but tenants and other parties having an interest in the condemned property.

> *N.J.S.A.* 20:3-6 reads, in relevant part:
>
> [N]o action to condemn shall be instituted unless the condemnor is unable to acquire such title or possession through bona fide negotiations with the prospective condemnee, *which negotiations shall include an offer in writing by the condemnor to the prospective condemnee holding the title of record to the property being condemned,* setting forth the property and interest therein to be acquired, the compensation offered to be paid and a reasonable disclosure of the manner in which the amount of such offered compensation has been calculated, and such other matters as may be required by the rules.
>
> Prior to such offer, the taking agency shall appraise said property and the owner shall be given an opportunity to accompany the appraiser during the inspection of the Property....
>
> When the holder of the title is unknown, resides out of the State, *or for other good cause, the Court may dispense with the necessity of such negotiations.*
>
> [Emphasis added.]

Under the Eminent Domain Act, the negotiations are to be undertaken with the condemnee *who holds title of record to the property.* Given the breadth of the term "condemnee," the limitation in Section 6 on the "condemnee" with whom the condemnor must negotiate to the "condemnee who holds title of record" avoids the difficult requirement of negotiating with each condemnee having an interest in the property. At oral argument, we considered the case of a highway widening abutting a strip mall. Before a taking, the State would have to negotiate with the mall owner, the anchor tenants, the mortgagees, and others having "an interest in the property being condemned." The rights of all other condemnees with a compensable interest are better protected by allowing them to participate later during the Commissioner's hearing, where value is determined, *N.J.S.A.* 20:3-12, and

during the still subsequent proceeding when the compensation is allocated. *N.J.S.A.* 20:3–34; *Rule* 4:73–9. *See State v. New Jersey Zinc Co.*, 40 *N.J.* 560, 193 *A.*2d 244 (1963) (holding that New Jersey follows the "unit rule" appraising in condemnation not each constituent interest's value, but the total bundle of rights making up fee).

■ Our law has frequently recognized that the purpose of the statutorily-required negotiations set forth in Section 6 is to encourage settlements and the voluntary acquisition of property needed for public purposes, allowing both the public entity and land owner to avoid the expense and delay of litigation and a trial, while permitting the land owner to receive just compensation. *See, e.g., State ex rel. Comm'r of Transp. v. Town of Morristown*, 246 *N.J.Super.* 156, 586 *A.*2d 1342 (App.Div.1991), *rev'd on other grounds*, 129 *N.J.* 279, 609 *A.*2d 409 (1992).

■ That statutory purpose was accomplished because the compensation agreement eliminated any legal dispute between the City and Cynwyd. *Township of Millburn* establishes that those with whom a condemnor negotiates prior to the filing of suit may elect to waive strict compliance with the statutory provisions of Section 6. 68 *N.J.* at 427, 346 *A.*2d 601. Cynwyd has done that.

This is not a case in which the parties were forced into litigation because they disagreed about compensation and the condemnor refused to provide an appraisal or other information concerning its offering price. It is in those cases, and invariably at the request of the record owner of a property, that courts have dismissed a condemnation complaint and directed a condemnor to comply strictly with the procedural steps set forth in Section 6. *Borough of Rockaway, supra*, 186 *N.J.Super.* at 351, 452 *A.*2d 694. The trial court read *Whispering Woods, supra*, 222 *N.J.Super.* at 7, 535 *A.*2d 968, for the principle that a condemnation complaint ought not be dismissed for failure strictly to comply with the procedural prerequisites to suit without an inquiry as to whether the title holder was prejudiced thereby. The trial court found that Cynwyd had suffered no prejudice because it and the City had agreed on valuation.

■ Caesars argues that, as a ninety-nine-year lessee of the Property, it was entitled to the same rights under Section 6 as the condemnee holding the title of record of the property being condemned. In some circumstances, New Jersey courts have held that ninety-nine-year lessees are equivalent to fee simple owners under the common law. *Lake End Corp. v. Township of Rockaway*, 185 *N.J.Super.* 248, 256, 448 *A.2d* 475 (App.Div.1982) ("[a]s a matter of law and fact, ninety-nine-year leaseholds are the equivalent of a fee ownership for the purposes of real property taxation, valuation and assessment.") *See Ric–Cic Co. v. Bassinder*, 252 *N.J.Super.* 334, 599 *A.2d* 943 (App.Div.1991) (granting standing to ninety-nine-year perpetual lessee to apply for variances under *N.J.S.A.* 40:55D–3 to –4). However, in *West Jersey Grove Camp Association v. City of Vineland*, 80 *N.J.Super.* 361, 193 *A.2d* 785 (App.Div.1963), the court declined to afford property tax exemptions to holders of ninety-nine-year leases that were not renewable. Whether a ninety-nine-year lessee should be considered a *de facto* fee simple owner for condemnation purposes constitutes an issue of first impression. In general, the rights of the holder of a ninety-nine-year lease depend on the contract and the legislative intent underlying the applicable statutory regime. Although ninety-nine-year lessees are deemed to be equivalent to fee simple owners for certain purposes under the law, we decline to apply the doctrine to condemnation. There are instances when the decision to condemn must be made very swiftly and it might be difficult to ascertain the terms of leasehold interests.

■ We do not, however, hold that a condemnee holding record title may waive the procedural rights under the act without consideration of the rights of other condemnees. Section 6 permits a court to dispense with the required negotiations for "good cause." Care must be taken to ensure that the cause is good. Thus, a court probably should dismiss a complaint in condemnation if the waiver of procedural rights by a holder of record title works an actual prejudice to other condemnees, including ninety-nine-year lessees.

The point to be remembered about this case is that the processes of law were not completed upon filing of the complaint. At oral argument, the case was described as being "just at the starting gate." The motion to dismiss the condemnation proceeding was based on precondemnation activities, not the actual condemnation itself. The fact that Cynwyd and the City had agreed on a figure for purposes of condemnation may have been sufficient to authorize the City to institute the condemnation proceedings, but that would not, in our judgment, foreclose the participation of Caesars or Square in the condemnation trial itself. *See State ex rel. Comm'r of Transp. v. Jan–Mar, Inc.*, 210 *N.J.Super.* 236, 241, 509 *A.*2d 310 (Law Div.1985) (holding that condemnee with compensable interest is permitted to offer noncumulative evidence of value at Commissioners' hearing); *New Jersey Sports & Exposition Auth. v. East Rutherford*, 137 *N.J.Super.* 271, 292, 348 *A.*2d 825 (Law Div.1975) (holding same). It is evident to us that although Caesars and Square may not have had compensable interests in the award itself, there were differing interests in the outcome of the condemnation that would have required their participation. The condemnation process involves the exercise of one of the most awesome powers of government.

Generally, when the exercise of eminent domain results in a substantial benefit to specific and identifiable private parties, "a court must inspect with heightened scrutiny a claim that the public interest is the predominant interest being advanced." *Poletown Neighborhood Council v. City of Detroit*, 410 *Mich.* 616, 304 *N.W.*2d 455, 459 (1981). In determining whether projects with substantial benefit to private parties are for a public purpose, this Court has held that the trial court must examine the "underlying purpose" of the condemning authority in proposing a project as well as the purpose of the project itself.

[*Wilmington Parking Auth. v. Land With Improvements*, 521 *A.*2d 227, 231 (De.1986).]

The power of eminent domain must always be exercised in the public interest and without favor to private interests. The proper solution to vindicate the public interest in this case would have been to have Caesars and Square participate in the valuation proceedings to present noncumulative evidence of fair value. Ordinance 61 never contemplated that anything other than fair value would be paid for the Property. Whether after exercise of the

option the interests of the parties commend such action is for them to decide.

The judgments of the Appellate Division are affirmed.

*For affirmance*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, GARIBALDI, STEIN and COLEMAN—6.

*Opposed*—None.