775 A.2d 657 (2001)
341 N.J. Super. 580
TOWNSHIP OF WEST ORANGE, a municipal corporation, Plaintiff-Respondent,
v.
769 ASSOCIATES, LLC, a New Jersey Limited Liability Company, Defendant-Appellant, and
Maricusa Corp., a New Jersey Corporation; Local American Bank of Tulsa, a Federal Savings Bank; and American Cancer Society, New Jersey Division, Inc., Defendants.
Superior Court of New Jersey, Appellate Division.
Argued May 29, 2001.
Decided July 2, 2001.
*658 Dennis J. Drasco, Roseland, argued the cause for appellant (Lum, Danzis, Drasco, Positan & Kleinberg, attorneys; Mr. Drasco, of counsel and on the brief; Kevin J. O'Connor, Morristown, also on the brief).
Richard S. Schkolnick, West Orange, argued the cause for respondent (Rabinowitz, Trenk, Lubetkin & Tully, attorneys; Mr. Schkolnick, of counsel and on the brief).
Before Judges PETRELLA, BRAITHWAITE, and WELLS.
The opinion of the court was delivered by PETRELLA, P.J.A.D.
This is an appeal from a ruling that a condemnation proceeding by plaintiff Township of West Orange (Township) was appropriate and served a public purpose. Defendant 769 Associates, LLC (Associates) argues that the condemnation of a portion of its property was designed to serve a private interest and that there was no valid public purpose warranting the condemnation. Defendant seeks a reversal of the motion judge's ruling and the dismissal of the Township's condemnation action.
Associates owns property at 769 Northfield Avenue in West Orange, consisting of a medical office building and a parking lot that services the building. Approximately 2,000 feet north of Northfield Avenue and 2,000 feet west of Pleasant Valley Way, lies 58.70 acres of land on which Nordan Realty Corp. (Nordan), a private developer, intends to construct a relatively high-density housing development, consisting of ninety-five single-family market value homes, to be known as Northfield Village.
To the north of Nordan's site is another proposed development, designated as Bel-Aire at West Orange, where approximately 198 single-family homes are planned for development. West of Nordan's site is a single-family home. Southeast of Nordan's property is a 52-acre tract owned by the Township, consisting of vacant woodlands and zoned for residential use. On the east, Nordan's property abuts South Mountain Reservation, an Essex County Park.
On March 5, 1986, the West Orange Planning Board (Board) passed a resolution granting preliminary site plan approval to Nordan for Northfield Village. Access to the site was originally contemplated by use of Cedar Avenue to Pleasant Valley Way. Cedar Avenue, shown as a roadway on various maps, borders the northern side of the Nordan property and extends west from Pleasant Valley Way to the border of Livingston Township. The roadway is in a hilly area of the Township, as the Nordan and Bel-Aire properties appear to be. Currently, Cedar Avenue is a gravel and dirt road, for some part, that is not fully improved and contains slopes that slightly exceed those allowed in the Township ordinance. Although the roadway requires utilities, drainage, curbing, pavement, and sidewalks, it is a dedicated street and is considered a public right-of-way.
Opposition to the proposed Cedar Avenue access was raised, beginning in the late 1980s, by persons residing near Cedar Avenue who formed the Oldstead Residential *659 Association and appeared at Planning Board hearings to object to the proposed development of the roadway. Herbert Waldman, who was a member of that Association and one of the residents that opposed the Cedar Avenue access, also served as councilman from 1990 to 1998, and voted, as a councilman and as a member of the Planning Board, on the project as well as the access that was subsequently proposed, which resulted in institution of condemnation proceedings against private property owned by Associates. Associates has asserted political motivation, without specifically arguing conflict of interest.[1]
Eventually, it was determined that an alternate means of access to the Nordan property via Northfield Avenue should be studied. The Township commissioned a traffic study by Hamal Associates, Inc., paid for by Nordan, to consider alternate access to Nordan's property. On December 9, 1991, Hamal presented its report, which proposed, as an alternative to the Cedar Avenue access, the construction of a new roadway parallel to and west of Pleasant Valley Way, and aligned to meet with Northfield Avenue near the point where it curves to meet Pleasant Valley Way.[2] The proposed roadway would utilize a twenty foot wide right-of-way owned by Nordan, as well as property acquired, partially through condemnation, from adjacent property owners, including a strip of land of approximately one-half acre on the western edge of Associates' property within a couple of feet of Associates' medical office building.
On July 24, 1992, Nordan and the Township entered into a Developer's Agreement providing that the Township Council "shall determine access and egress to Northfield Avenue not inconsistent with" the December 9, 1991, Hamal Associates Traffic Study. The Agreement also provided that Nordan was to negotiate with the adjoining property owners to secure the necessary right-of-way to access its property. If the negotiations were successful, Nordan was to bear the cost of constructing the right-of-way. However, if the right-of-way could not be acquired through negotiations after a reasonable period of time, the Township was obligated under the Agreement to use its eminent domain powers to acquire the property, with Nordan reimbursing the Township for all legal fees, professional fees, court costs, acquisition costs and reasonable attendant costs incurred by the Township.
Amendments to the Developer's Agreement were made in April 1993 and July 14, 1994, under which the Township agreed to an additional single-family lot in consideration *660 for Nordan's donation of $10,000 to the West Orange Community House. Moreover, Nordan was to pay the Township an additional $40,000 upon receiving subdivision approval and a certificate of occupancy. Finally, Nordan was required to make a series of payments totaling $500,000 to the Township.[3]
On July 11, 1995, the Township Council adopted Ordinance No. 1342-95, authorizing the Township to condemn and acquire, through its eminent domain power, an easement across Associates' property "to facilitate the development of the Nordan Tract and bring new ratables to the Township." This ordinance was repealed by Ordinance No. 1386-96 "to facilitate a more orderly and equitable transition period for the parties to be [a]ffected and the Township as a whole." A revised ordinance was adopted on March 26, 1996.
In October 1995, Nordan applied to the Township planning board for major subdivision approval. On December 4, 1996, the Board approved the location of the access road along Associates' property. The Board's accompanying resolution approved the proposal "subject to the applicant acquiring property for the access road to Northfield Avenue, as provided in the developer's agreement."
A third amendment to the Developer's Agreement was executed on August 26, 1997, and required the Township, within sixty days of a written request from Nordan, to institute condemnation proceedings in the Superior Court to acquire the necessary additional right-of-way. The amendment specified that Nordan was to indemnify and reimburse the Township for all "legal, engineering, appraisal and other professional and non-professional fees and expenses incurred" by the Township in acquiring the land through eminent domain proceedings.
On September 2, 1997, the Township adopted Ordinance No. 1445-97, authorizing condemnation of the portion of Associates' land needed to construct the access road for Nordan. The ordinance noted that Nordan had unsuccessfully attempted to purchase the necessary land from Associates. The stated purpose of the ordinance was "not only [to] serve the public's interest in securing access to the Project but ... also ... [to] provide access to other properties and proposed developments in the immediate vicinity."[4] Councilman *661 and later Council President Waldman voted in the affirmative on all of these resolutions and the adoption of the ordinance.[5]
On January 14, 1998, the Township filed a condemnation complaint and obtained an order to show cause, returnable February 20, 1998, for appointment of condemnation commissioners to determine the amount of compensation required to be paid to Associates pursuant to N.J.S.A. 20:3-12.
Associates filed an answer and opposed the Township's application, asserting, among other things, that the proposed condemnation constituted an unlawful taking of private property for private use and not for any legitimate public use. Moreover, Associates requested a stay of the condemnation action, pursuant to N.J.S.A. 20:3-11, pending discovery.
On May 3, 1998, Judge Weiss, the then Assignment Judge, stayed all proceedings in the condemnation action "pending resolution of the challenge to the Township's authority to take and for failure to conduct good faith negotiations." Associates was granted leave to conduct discovery regarding the purported public purpose of the proposed taking.
On September 28, 1998, Judge Weiss dismissed the Township's complaint for failure to provide responses to Associates' discovery requests. After not receiving any discovery responses for three months following the dismissal of the complaint, Associates moved for an order under N.J.S.A. 20:3-35, declaring that the Township had abandoned the condemnation. The Township then moved to vacate the dismissal and served discovery responses upon Associates, although they were later found to be deficient. Associates' motion for a declaration of abandonment was denied and the Township's motion to vacate was granted, subject to the Township providing more responsive discovery answers.
The matter was assigned to another judge who, after oral argument, concluded that the "condemned property will be used by the municipality as a public road for ingress and egress out of the Nordan property, as well as ingress and egress for the Bel-Aire property, which adjoins Nordan." The judge ruled that the municipality had the power to condemn because it was for a public road. Associates appeals this ruling.

I.
Generally, a government entity may take, or condemn, private property where it is in furtherance of a valid public purpose, and where just compensation has been made to the owner. U.S. Const. amend. XIV; N.J. Const. Art. I, § 20 ("Private property shall not be taken for public use without just compensation."); State v. Silver, 92 N.J. 507, 513, 457 A.2d 463 (1983).
When a municipality adopts an ordinance in the exercise of its power of eminent domain, that determination is usually presumed valid and entitled to great deference. Essex Fells v. Kessler Inst., 289 N.J.Super. 329, 337, 673 A.2d 856 (Law Div.1995). Where, however, a condemnation is commenced for an apparently valid public purpose, but the real purpose is otherwise, the condemnation may be set aside. Id. at 338-339, 673 A.2d 856; see also Tennessee Gas Transmission Co. v. Hirschfield, 39 N.J.Super. 286, 288, 120 *662 A.2d 886 (App.Div.1956) (the decision to condemn shall not be enforced where there has been a showing of "improper motives, bad faith, or some other consideration amounting to a manifest abuse of the power of eminent domain"). The burden of demonstrating an abuse of discretion is on the condemnee. State Highway Comm'r v. Totowa Lumber & Supply Co., 96 N.J.Super. 115, 124, 232 A.2d 655 (App. Div.1967).
Associates argues that the primary purpose of the taking was to serve private, not public, interests and that under City of Atlantic City v. Cynwyd Investments, 148 N.J. 55, 689 A.2d 712 (1997), courts apply "heightened scrutiny" to a claim that the public interest was the predominant interest being advanced. Specifically, Associates notes that Cynwyd cautioned: "The power of eminent domain must always be exercised in the public interest and without favor to private interests." Id. at 73, 689 A.2d 712. It also relies on the following quotation in Cynwyd:
Generally, when the exercise of eminent domain results in a substantial benefit to specific and identifiable private parties, "a court must inspect with heightened scrutiny a claim that the public interest is the predominant interest being advanced." Poletown Neighborhood Council v. City of Detroit, 410 Mich. 616, 304 N.W.2d 455, 459 (1981). In determining whether projects with substantial benefit to private parties are for a public purpose, this Court has held that the trial court must examine the "underlying purpose" of the condemning authority in proposing a project as well as the purpose of the project itself.
[Id. at 73, 689 A.2d 712, quoting Wilmington Parking Auth. v. Land With Improvements, 521 A.2d 227, 231 (De. 1986)].
The Township argues that heightened scrutiny is not the correct standard, relying on CRDA v. Banin, 320 N.J.Super. 342, 346, 727 A.2d 102 (Law Div.1998), where the judge, quoting from a decision in a prior summary judgment motion in that case, stated:
A careful reading of Cynwyd makes it clear that the Supreme Court was not establishing a new `heightened scrutiny' standard of review as argued by defendants. By referring to Wilmington Parking Auth., however, the Court did reaffirm the established principle that where the real purpose of the condemnation is other than the stated public purpose, the condemnation may be set aside.
In CRDA, the Law Division Judge did not explain why he believed Cynwyd did not adopt the heightened scrutiny standard nor is there any rationale for such an assertion. Clearly the eminent domain power must be exercised in the public interest, thus warranting heightened scrutiny when private parties are substantially benefitted. Heightened scrutiny is the appropriate standard for such cases.

II.
Associates argues that the proposed taking will accord a substantial benefit to Nordan, a private party, which will be able to construct its housing development with the completion of the taking. Nordan may in fact be able to use more of its land for lots suitable for profitable building as a result of the condemnation. Associates asserts that allowing a private builder to construct a development is not a valid public use warranting condemnation. Otherwise, almost any property could be condemned to aid private profit-making ventures.
*663 The fact that a private party may benefit from a condemnation does not necessarily render the use private if the benefit is truly incidental, rather than the principal purpose. See State v. Buck, 94 N.J.Super. 84, 88, 226 A.2d 840 (App.Div.), certif. denied, 49 N.J. 359, 230 A.2d 393 (1967), appeal dismissed, 389 U.S. 571, 88 S.Ct. 693, 19 L.Ed.2d 780 (1968) (acquiring entire tract rather than leaving small borderline strip and avoiding landlocking property did not defeat condemnation); Julius L. Sackman, 2A Nichols' The Law of Eminent Domain § 7.08[2] (3d ed. rev. 1989) (Nichols') ("It does not derogate from the public nature of an improvement that its construction will cause an incidental private advantage to accrue to neighboring lands, if the improvement is established for the public use."). Furthermore, the incidental benefit to private interests "will not defeat a condemnation proceeding; the controlling question is whether the paramount reason for taking land to which objection is made is in the public interest." State v. Buck, supra (94 N.J.Super. at 88, 226 A.2d 840) (citation omitted).
Essex County v. Hindenlang, 35 N.J.Super. 479, 488, 114 A.2d 461 (App. Div.1955), appeal dismissed, 24 N.J. 517, 132 A.2d 807 (1957), is instructive as to what constitutes a public use:
Courts dealing with problems of eminent domain have generally been reluctant to define the phrase "public use." ... [T]hey have recognized that the phrase "is incapable of a precise and comprehensive definition of universal application."... Judicial attempts to describe the subjects to which the expression "public use" would apply have proceeded on two different theories. One theory of "public use" limits its application to "use by the public"public service or employment.... Courts that take the broader and more liberal view in sustaining public rights at the expense of property rights hold that "public use" is synonymous with "public benefit," "public advantage" or "public utility."
New Jersey has adopted a broader view as to the meaning of "public use." State Highway Comm'r v. Totowa Lumber & Supply Co., supra (96 N.J.Super. at 119, 232 A.2d 655).
In most cases, highway construction is considered a public use, even where condemnation avoids property becoming landlocked by other State highway construction. See State Highway Comm'r, v. Davis, 87 N.J.Super. 377, 209 A.2d 633 (App.Div.), cert. denied, 46 N.J. 135, 215 A.2d 30 (1965); State v. Buck, supra (94 N.J.Super. at 84, 226 A.2d 840). Here, the Township Council's stated purpose in enacting the ordinance authorizing the condemnation was to "serve the public's interest in securing access to the [Nordan] Project" and to "provide access to other properties and proposed developments in the immediate vicinity." It was not incidental to any other road construction. The motion judge apparently agreed with the Township, stating that "the condemned property will be used by the municipality as a public road for ingress and egress out of the Nordan property, as well as ingress and egress for the Bel-Aire property, which adjoins Nordan."[6]
We apply the heightened scrutiny required under Cynwyd to the Township's action here. The reasons given by West Orange to support the condemnation of Associates' property, effectively on behalf of Nordan, could equally apply to the use of Cedar Avenue for access to Nordan's *664 property as originally proposed. Indeed, the Hamal traffic study considered Cedar Avenue a viable alternative. The Township's attorney mentioned at oral argument that sections of Cedar Avenue have a steep incline. Presumably, engineering work might reduce that, perhaps at a lesser or equal cost than that of the proposed condemnation.
Here, the Township did not rely upon any statute authorizing condemnation for redevelopment purposes or to ameliorate blighted areas. Although there was local neighborhood opposition to the use of Cedar Avenue, the position of community members does not control or dictate the Township's exercise of its eminent domain power. No sufficient reason appears in the present record to warrant the exercise of eminent domain power to construct the proposed southerly right-of-way instead of utilizing a Cedar Avenue route. Unless it could be proven that access to Cedar Avenue is non-existent or precluded by law, the Nordan development would technically not be landlocked without the proposed right-of-way. Although the record does not establish that Nordan's property is landlocked, the fact that property might be landlocked, and not so created by a public entity, does not warrant the exercise of eminent domain for private development. The power of eminent domain by government or public agencies is an awesome power which may only be properly used for a public purpose.
The Hamal Associates traffic study described the proposed right-of-way connection at Northfield Avenue as the "best proposal" for a "second means of full access" to the Nordan site. The traffic study indicated that Nordan would principally benefit from the roadway as it was "unlikely that externally attracted cut though traffic would be encountered" because of the "low speed, winding and lengthy nature of the entire access roadway." Thus, the proposed roadway would obviously have its own drawbacks, as would Cedar Avenue in its current partially improved state. However, whether or not the Cedar Avenue route may be used for heavier traffic patterns does not justify a taking of private property to benefit high-density, profit-making building projects. Indeed, the denial of the use of Cedar Avenue to a landlocked property owner might result in a compensable taking of property. See Washington Market Enterprises v. Trenton, 68 N.J. 107, 118, 343 A.2d 408 (1975); Lomarch Corp. v. Mayor of Englewood, 51 N.J. 108, 113, 237 A.2d 881 (1968). The primary purpose of the proposed right-of-way, which would be established partly through condemnation, is to serve the private interests of Nordan.

III.
Associates argues that the Township improperly bargained away its power of eminent domain to Nordan. The fact that Nordan was to reimburse the Township for all costs associated with the condemnation makes it clear that Nordan is using the Township as its alter ego to acquire by condemnation what it could not do through negotiation.
In support of its argument, Associates relies upon Square Brighton v. Atlantic City, 287 N.J.Super. 450, 458, 671 A.2d 203 (App.Div.1996), aff'd sub nom. City of Atlantic City v. Cynwyd Investments, 148 N.J. 55, 689 A.2d 712 (1997), where a hotel instituted suit against Atlantic City compelling it to exercise its eminent domain power to acquire a strip of land. A settlement was reached between the hotel and Atlantic City in which the city committed itself to acquiring the strip either by consent through an arm's length bona fide transaction or, if unsuccessful, to exercise its eminent domain power. Id. at 452-453, *665 671 A.2d 203. Under the ordinance that was adopted, the hotel was to pay "one-hundred percent of the fair market value `compensation'" plus all associated costs incurred by the City to acquire the street. Id. at 453, 671 A.2d 203. We held that the ordinance did not violate the Local Budget Law and that the private party's payment of the cost of the condemnation was permitted pursuant to N.J.S.A. 40A:5-28, which authorizes and empowers municipalities to accept bequests, legacies and gifts if used for a valid purpose.
The instant case is distinguishable from Square Brighton because in that case there was no dispute as to whether the taking was for a public use. Furthermore, eminent domain was only to be used if the City, not the private party seeking the condemnation, was unable to acquire the property through negotiation. Here, however, the primary purpose of the proposed condemnation is to serve the interests of a private developer and obviate objections from some homeowners to increased traffic near their homes.
Associates' argument that there was an invalid or illegal bargaining away of the Township's eminent domain power is persuasive. The determination of whether to authorize the condemnation was not solely within the Township's discretion as it bound itself in the Developer's Agreement to condemn the land if Nordan, a private party, could not acquire it through negotiations. Moreover, Nordan was given the power to determine when the Township should institute eminent domain proceedings to acquire the property necessary for the proposed roadway. We conclude that the judge's finding that Associates had not demonstrated an abuse of discretion by the Township is unsupported by the record. Hence, applying heightened scrutiny, we conclude that the condemnation proceeding was primarily for a private purpose and was improper.
Reversed and remanded for dismissal of the condemnation complaint.
NOTES
[1] Because of certain arguments in the brief submitted by Associates as well as references in oral argument, we requested and received supplemental letter briefs, limited to legal argument on the record, on conflicts of interest under the common law, the planning act (N.J.S.A. 40:55D-23b) and the State conflicts of interest law (N.J.S.A. 40A:9-22.1 et seq.). The record does not contain sufficient information to determine whether an actual or potential conflict of interest tainted municipal action in the proceedings before the Planning Board or relative to the authorization of condemnation proceedings. Hence, we do not decide this issue, but mention it because of the arguments made. Additional material submitted by the Township is not in the record and we decline to supplement the record. We can take judicial notice of prior litigation regarding Nordan's property and Nordan and Essex County and a technical challenge to compliance with Green Acres requirements before Judge Weiss. Additional factors were involved, including construction of three comfort stations on parkland. The case was decided on a very limited issue and the judge eschewed any ruling on private property rights.
[2] The traffic study was supplemented by an April 1993 Amendment.
[3] Two of these payments, consisting of $75,000 each, were made to Mayor Spina and presumably deposited into the Township's general fund. The payments were not deposited into the affordable housing fund. Cf. Bi-County Dev. of Clinton, Inc. v. High Bridge, 341 N.J.Super. 229, 775 A.2d 182 (App.Div. 2001).
[4] A 1995 Essex County map published by the Board of Chosen Freeholders, compared with the Project Location Map, indicates that from Cedar Lane southerly across the various courses to Northfield Avenue, the proposed route appears to impinge on its easterly side on the areas known as "South Mountain Reservation," a County Park facility subject to Green Acres restrictions. However, the existing Cedar Avenue route appears to lie outside the northern end of that area. Although counsel for the Township argues that the Cedar Avenue route was burdened by Green Acres restrictions, the maps and the record before us do not fully support that contention. But even Green Acres applicability would not automatically terminate private ownership rights or interest. There is nothing in the record that indicates that the private property rights of any person or entity in Cedar Avenue were divested or taken by eminent domain or in any other way. The record before us also contains what appears to be a resolution of the Township dated July 21, 1992, which recites, contrary to representations at the trial level regarding accessability, that Nordan's property "is accessible through an unimproved right-of-way for Cedar Avenue and a separate 20' wide parcel from Northfield Road...." Some deeds in the record refer to the Cedar Avenue right-of-way as 50 to 60' wide and appear to indicate that Essex County's interest in the adjacent parkland was subject to the existing dedication of Cedar Avenue. Our determination herein does not turn on the foregoing observations or representations of counsel.
[5] See footnote 1, supra.
[6] The access to the Bel-Aire development, not yet built as we understand it, would be for secondary access because it presumably would have separate access to Mount Pleasant Avenue, which abuts the eastern edge of its property.